583 F.2d 19
 78-2 USTC P 13,257
 MERCHANTS NATIONAL BANK, Executor of the Estate of Marian A.
Burdick, Plaintiff, Appellee,
v.
UNITED STATES of America, Defendant, Appellant.
MERCHANTS NATIONAL BANK, Executor of the Estate of Marian A.
Burdick, Plaintiff, Appellant,
v.
UNITED STATES of America, Defendant, Appellee.
 Nos. 78-1043, 78-1060.
 United States Court of Appeals,
First Circuit.
 Argued June 6, 1978.
Decided Aug. 21, 1978.
 
 William J. Lehrfeld, Washington, D. C., with whom Webster & Chamberlain, Washington, D. C., Robert A. Raulerson, Bruce W. Felmly and McLane, Graf, Greene, Raulerson & Middleton, Manchester, N. H., were on brief, for Merchants Nat. Bank.
 William S. Estabrook, III, Atty. Tax Div., Dept. of Justice, Washington, D. C., with whom William H. Shaheen, U. S. Atty., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Richard W. Perkins, Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for U. S.
 Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.
 COFFIN, Chief Judge.
 
 
 1
 The issue in these appeals in an estate tax refund suit is whether the district court erred in its generous evaluation of the deduction attributable to a charitable remainder.
 
 
 2
 The will of testatrix Marian A. Burdick created a trust fund for the Shriners' Hospital for Crippled Children of Springfield, Massachusetts, with all income from the trust fund to be paid to her sister Mildred A. Niles during her lifetime. Testatrix died on May 29, 1973 and her sister, at age 84, died five and one half months later on November 15, 1973.
 
 
 3
 The estate paid a total amount of $215,611.42 in estate taxes. Through remedial legislation, it obtained a refund of principal and interest in the amount of $163,084.18. It now seeks an additional refund of its alleged overpayment in the amount of $59,898.93. It has advanced several arguments to support its interpretation of the relevant statutes.[1] The first, the ground on which the district court rested in granting summary judgment for the estate, is that under 26 U.S.C. § 2055(a) the death of Mildred before the date for filing the estate tax return (nine months after testatrix' death) operated as an "irrevocable disclaimer" of "a power to consume, invade, or appropriate property." The second ground, not passed on below, is that 26 U.S.C. § 2055(e)(2) did not bar a charitable deduction since, the estate claims, no interest "passed or has passed from the decedent" to a non-charity. Here the estate invokes New Hampshire law which imposes a moratorium on the payment of income to a pecuniary legatee for one year following the death of a testator. See, e. g., White v. Chaplin, 84 N.H. 208, 148 A. 21 (1929). The estate argues from this that no interest "vested", i. e., "passed" within the meaning of § 2055(e)(2) to Mildred, and thus that the entire estate is deductible as a gift to charity.
 
 
 4
 A third ground, again not reached by the district court, is an attack on certain regulations, drawn up in order to implement § 2055(e)(3). This section is avowedly remedial legislation, under which trusts such as that at issue here can be "deemed" to conform to rather complex requirements so that they can qualify for charitable deductions. The valuation of the charitable remainder, under Temporary Estate Tax Regulation § 24.1, is arrived at by assuming that the life interest (which must be deducted from the total estate to obtain the value of the remainder) was an annuity paid at the rate of six percent of the total fair value for the "expected" life of Mildred as of Marian's date of death. The estate, asserting these regulations are unreasonable and void, would substitute a five percent rate for the actual period (5 1/2 months) Mildred survived her sister. These two adjustments would so reduce any diminution of the value of the charitable remainder as to command a refund of the entire amount in issue. A fourth issue raised by the estate must be faced if a refund is based on § 2055(e)(3), whether the implementing regulations are held valid or not. Under the last sentence of this statute, interest is not allowed for the first 180 days after the claim for refund is filed. The estate, contending that interest should accumulate from the time of overpayment, attacks this statutory provision as unconstitutional.
 
 
 5
 Our first question is whether the district court erred in holding that the death of the life tenant before the prescribed filing date of the estate tax return operated as a disclaimer of "a power to consume, invade, or appropriate property". The issue is, more specifically, whether Mildred's interest, a simple life interest, is also "a power to consume . . . ." We think that the government has the better of this argument. In the first place § 2055(a), in its beginning paragraph, refers to disclaimers "of a bequest, legacy, devise, transfer or power", arguably distinguishing transfers of interest from powers. More persuasively, the legislative history points to a deliberate focus on a power to consume principal in the effort to equate death to a statutory disclaimer. A case involving the estate of Solomon Allinger, had been brought to the attention of the Senate Finance Committee. Hearings Before Committee on Finance, United States Senate, 83d Cong., 2d Sess., on H.R.8300 (Part I), 293-295. The testator had left his residuary estate to a charitable remainder trust, subject however to (a) payments of net income to his wife for her life and (b) a power in the trustee, in its discretion, to expend principal for the life tenant. The wife died within 47 days after testator's death. The problem which the executors faced was that under Merchants National Bank of Boston v. Commissioner, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943) and Union Planters National Bank & Trust Co. v. Henslee, 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1949), the mere existence of a broad power to invade principal was held to render the value of a charitable remainder so uncertain that No deduction could be allowed. The curative device of what is now § 2055(a) was enacted to permit the death of a beneficiary of such a power before the due date of the estate tax return to have the effect of a disclaimer. The estate has argued that since a mere life interest was also involved in the Allinger problem, § 2055(a) must also refer to an interest in income as well as power to invade the principal. But it neglected to tell us that the Allinger executors specifically acknowledged that the charitable deduction would have to be reduced by the value of the life estate; they took issue only with the doctrine as to powers.[2]
 
 
 6
 The estate's second argument is that no interest "passes or has passed" (within the meaning of § 2055(e)(2)) to Mildred because of the principle of New Hampshire law that no interest is payable on a pecuniary legacy for the first year following a testator's death. See, e. g., White v. Chaplin, supra. Whatever the purpose or effect of the New Hampshire rule, it does not mean that the testator did not provide a life interest for her sister to precede the falling in of the remainder. Since the value of a life interest is ordinarily determined by actuarial tables, and, correspondingly, the present, discounted, value of the remainder is based upon the normal expectancy of the life tenant, it is both over-technical and unsound to argue that it makes a difference when the life tenant commences to receive payments. Moreover, the Internal Revenue Code does not leave this issue to the vicissitudes of state law. The definition of "passes or has passed" is a matter covered by Treasury Regulations, 26 C.F.R. § 20.2055-2(e). Apart from the principle of § 2056, under which marital deductions may be disallowed if subject to defeasance for some subsequent event or contingency, not here applicable, the critical guideline is:
 
 
 7
 "If, however, as of the date of a decedent's death, a transfer for a private purpose is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, an interest in property will be considered to pass for a private purpose unless the possibility of occurrence of such act or event is so remote as to be negligible."
 
 
 8
 Even if, therefore, New Hampshire law required Mildred to survive her sister by one year for any interest to pass, we cannot say on this record that, as of the date of the testatrix' death, Mildred's survival was a "negligible" possibility.[3]
 
 
 9
 We thus conclude that the extent of the charitable deduction must be determined under § 2055(e)(3). This provision was intended to reduce the hardship on charitable recipients which otherwise would have been caused by tax law changes in 1969. These changes came about to correct abuses in deferred giving through testamentary transfers of charitable remainders. Congress acted by limiting a charitable deduction to remainder interests which were in the form of a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund. Because of the difficulty in satisfying these complex requirements within a short span of time, the Treasury Department by regulation allowed post death reformation of wills.
 
 
 10
 Part of § 2055(e)(3) allowed wills executed or trusts created before September 21, 1974 to be voluntarily amended by the parties up to a cut-off date, subsequently to be extended to December 31, 1977. Another part, more relevant to our situation, stated that if by the due date for filing of an estate tax return the interest in property had passed directly to a charity, "a deduction shall be allowed as if the governing instrument was amended or conformed under this paragraph." The relevant implementing regulation is Temporary Estate Tax Regulation, § 24.1(h), relating to transfers which are treated as if amended. This regulation requires the assumption that the instrument had created a charitable remainder annuity trust (a) providing an annuity of 6 percent of initial fair market value, and (b) such annuity being "for the expected lives of the noncharitable beneficiaries as determined on the date of death of the decedent."
 
 
 11
 The estate challenges these two provisions as being both unreasonable and "out of harmony" with § 2055(a)(3) of the Code, citing Manhattan Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). To sustain such a challenge to regulations promulgated under "legislative" authority to implement a statutory scheme is to carry a burden of "greater weight" than that required to overcome a routine interpretative regulation. Goldman v. Commissioner, 497 F.2d 382, 383 (6th Cir. 1974), Cert. denied, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 295.
 
 
 12
 The challenge to the 6 percent assumed rate of annuity rests on the fact that § 664(e) states that the "remainder interest of a charitable remainder annuity trust or charitable remainder unitrust shall be computed on the basis that an amount equal to 5 percent of the net fair market value of its assets (or a greater amount, if required under the terms of the trust instrument) is to be distributed each year." This is not quite the complete statutory picture, for § 664(d)(1)(A) and (2)(A), in defining the two kinds of trusts above referred to, specify that the annual payment for each be "not less than 5 percent" of fair market value.
 
 
 13
 We are unable to find this moderate administrative escalation of the statutory minimum interest rate either unreasonable or "out of harmony" with the statutory objective. The evil sought to be combatted by the 1969 legislation was the use of unrealistically low annuity rates for life beneficiaries, with the result that the value of charitable remainders was maximized while trustees easily exceeded the low annuity rates. H.Rep.No. 91-413, Part 1, 91st Cong., 1st Sess., p. 58 (1969 3 Cum.Bull. 200, 237). To have gone up from the 5 percent floor by 1 percent five years later, particularly in the absence of any evidence that this was unrealistic, seems well within any leeway which existed. That there must be some leeway would seem necessary if the statute's workability were not to depend on yearly amendment. We are reinforced in this view by § 642(c)(5) which defines a pooled income fund. For the purpose of determining the amount of a charitable contribution allowable by reason of a transfer to a pooled fund, the statute requires either that the income interest be the highest for any of the three years prior to transfer or, if the fund has not existed three years, "the rate of return shall be deemed to be 6 percent per annum, except that the Secretary or his delegate may prescribe a different rate of return." While a similarly explicit statutory delegation of power to prescribe a different rate would have removed any doubt about this issue, we cannot believe that Congress intended a leeway in valuing a charitable gift to a pooled fund which it did not in valuing charitable remainder annuity trusts and unitrusts.
 
 
 14
 The second challenge is to the use of the life expectancy of a life tenant at the death of a testator to measure the deemed term of a trust before final transfer to a charity. The estate argues that estates such as that at issue are considered amended because, within fifteen months of a decedent's death (if an extension for filing the estate tax return is granted), the intervening life estate has terminated. This being so, the estate concludes that it is anomalous to use actuarial life expectancy tables when we already know that the actual life duration was less than 15 months. We are urged also to bear in mind the aim of benefitting charities. This is tempting until we remind ourselves of the purpose of the statute on which the regulations are based. It is to allow time for the conforming of trust instruments to the law so that gifts to charities may qualify for deductions authorized. That is, the aim was to put wills and trusts in the position where, had there been adequate time and study, they would have been. The aim was not to put the charity recipients in a Better position. But that would be the effect if we adopted the estate's position; we would be singling out the testamentary charitable bequests made during the transition years. As to them we would not be valuing life estates by using the estimated lives of life tenants at a testator's death, but would be using the actual time of survivorship of the life tenant, which the remedial legislation would have predetermined to be less than 15 months.
 
 
 15
 While this would be a boon to the charities affected, there does not appear any reason of prudence or justice which calls for this result. And while Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), does not necessarily govern the rather special category within which this case falls, we see no basis for invalidating this Treasury Regulation.
 
 
 16
 This brings us to the estate's constitutional challenge to the statute governing a taxpayer's right to interest on a refund obtained as a result of treating a trust as conformed under § 2055(e)(3). The statute provides that "no interest shall be allowed for the period prior to the expiration of the 180th day after the date on which the claim for credit or refund is filed." The statute governing interest on other refunds allows interest from the date of overpayment to a date within 30 days of the date of a refund check. § 6611. The estate argues that it and all other executors of estates whose wills were amended or conformed between 1973 and 1977 are arbitrarily treated differently from "all other estate tax overpayers."
 
 
 17
 The estate would have us apply the "substantial relation" standard of Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), to determine if this distinction among taxpayers affronts equal protection. It also notes the absence of any rationale in the record justifying the interest limitation. The first argument misconceives the appropriate standard, which is that of relaxed scrutiny, under which a statutory classification will not be disturbed "if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). The second argument also misfires, since the background and purpose of § 2055(e)(3) reveal a rational basis for the 180 day moratorium in interest liability on the part of the government. The purpose can perhaps be seen most clearly in the case of instruments which were actually reformed by permission of § 2055(e)(3); time would have been needed to determine if the reformed provisions qualified under the law. But even as to the instruments "deemed" reformed by the passing of an interest directly to a charity, the determination of such a legally sufficient event may not be simple and may also require time. The Court of Claims in First National Bank of Oregon v. United States, 571 F.2d 21 (1978), has considered this issue in more detail and upheld the § 2055(e)(3) limitation on interest payments as rationally justifiable. We subscribe to its view.
 
 
 18
 Reversed.
 
 APPENDIX
 
 19
 SEC. 2055. TRANSFERS FOR PUBLIC, CHARITABLE, AND RELIGIOUS USES.
 
 
 20
 (a) In General. For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers (including the interest which falls into any such bequest, legacy, devise, or transfer as a result of an irrevocable disclaimer of a bequest, legacy, devise, transfer, or power, if the disclaimer is made before the date prescribed for the filing of the estate tax return) (to or for the use of charitable institutions) . . . For purpose of this subsection, the complete termination before the date prescribed for the filing of the estate tax return of a power to consume, invade, or appropriate property for the benefit of an individual before such power has been exercised by reason of the death of such individual or for any other reason shall be considered and deemed to be an irrevocable disclaimer with the same full force and effect as though he had filed such irrevocable disclaimer.
 
 
 21
 (e) Disallowance of Deductions in Certain Cases.
 
 
 22
 (2) Where an interest in property . . . passes or has passed from the decedent to a person, or for a use, described in subsection (a), and an interest . . . in the same property passes or has passed . . . from the decedent to a person, or for a use, not described in subsection (a), no deduction shall be allowed under this section for the interest which passes or has passed to the person, or for the use, described in subsection (a) unless
 
 
 23
 (A) in the case of a remainder interest, such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c) (5)) . . . .
 
 
 24
 (3) In the case of a will executed before September 21, 1974, or a trust created before such date, if a deduction is not allowable at the time of the decedent's death because of the failure of an interest in property which passes from the decedent to a person, or for a use, described in subsection (a), to meet the requirements (of (e)(2)(A) above), and if the governing instrument is amended or conformed (during the stated time period), so that the interest is in a trust which is a charitable remainder annuity trust, a charitable remainder unitrust . . . or a pooled income fund . . ., a deduction shall nevertheless be allowed. The Secretary or his delegate may, by regulation, provide for the application of the provisions of this paragraph to trusts whose governing instruments are amended or conformed in accordance with this paragraph . . . . If, by the due date for the filing of an estate tax return (including any extension thereof) . . ., the interest passes directly to a person or for a use described in subsection (a), a deduction shall be allowed as if the governing instrument was amended or conformed under this paragraph . . . . In the case of a credit or refund as a result of an amendment or conformation made pursuant to this paragraph, no interest shall be allowed for the period prior to the expiration of the 180th day after the date on which the claim for credit or refund is filed.
 
 
 
 [1]
 The statutory foundation for this suit primarily involves three provisions of the Internal Revenue Code, § 2055(a), § 2055(e)(2), and § 2055(e)(3), printed in relevant part in the Appendix to this opinion
 
 
 [2]
 Our view of the statute is also that of the treatises. Lowndes, Kramer and McCord, Federal Estate and Gift Taxes (3d ed.) § 16.6, pp. 424-25; Stephens and Maxfield, Federal Estate and Gift Taxation (3d ed.), pp. 5-51
 
 
 [3]
 We also note that this analysis is suggested by the examples in the regulation, particularly (4) and (5). To be contrasted with what "passes" to a non-charity, non-spouse recipient, example (6) indicates the effect of subsequent events in negating or cancelling out what would have been a gift to a spouse for a private purpose