UNITED STATES of America, Appellee,

v.

**Pedro SAADE, Appellant.**

UNITED STATES of America, Appellee,

v.

**Carlos Zenon RODRIGUEZ, Appellant.**

Nos. 80–1223, 80–1224.

United States Court of Appeals, First Circuit.

Argued Feb. 4, 1981.

Decided June 30, 1981.

Michael Ratner, New York City, with whom Luis F. Camacho, Cayey, P. R., Pedro Varela, Hato Rey, P. R., Margaret Ratner, Jose Antonio Lugo, and Doris Peterson, New York City, were on brief, for appellants.

Joel M. Gershowitz, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Raymond L. Acosta, U. S. Atty., San Juan, P. R., and William G. Otis, Atty., U. S. Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before CAMPBELL, BOWNES, and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Following a bench trial, Pedro Saade and Carlos Zenon Rodriguez were convicted of unauthorized entry into a military danger zone located off the southeastern coast of the island of Vieques during a naval gunnery practice session, in violation of 33 C.F.R. § 204.234[1] and 33 U.S.C. § 1.[2] The district court sentenced both of the appellants to the maximum term of six months imprisonment. Of the numerous grounds for reversal advanced by the appellants, the most telling is their challenge to the validity of 33 C.F.R. § 204.234. Before addressing this issue, we briefly describe the central events leading up to their convictions.

Early on the morning of January 19, 1980, three Navy destroyers began to conduct ship-to-shore gunnery target practice

---

1. 33 C.F.R. § 204.234 provides:

 (a) *The danger zone.* From Punta Conejo on the south coast of Vieques at latitude 18°06′30″, longitude 65°22′33″; thence to latitude 18°03′00″, longitude 65°21′00″, thence to latitude 18°03′00″, longitude 65°15′30″; thence to latitude 18°11′30″, longitude 65°14′30″; thence to latitude 18°12′00″, longitude 65°20′00″; and thence to Cabellos Colorados on the north coast of Vieques at latitude 18°09′49″, longitude 65°23′27″.

 (b) *Regulations.* (1) It will be open to navigation at all times except when firing is being conducted. At such times no surface vessels, except those patrolling the area, shall enter or remain within the danger area. Prior to conducting each firing or dropping of ordnance the danger area will be patrolled to insure that no watercraft are within the danger area. Any watercraft in the vicinity will be warned that practice firing is about to take place and advised to vacate the area.

 (2) The regulations will be enforced by the Commander, Caribbean Sea Frontier, San Juan, P.R., and such agencies as he may designate.

2. 33 U.S.C. § 1 provides in pertinent part:

 It shall be the duty of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department. Such regulations shall be posted, in conspicuous and appropriate places, for the information of the public; and every person and every corporation which shall violate such regulations shall be deemed guilty of a misdemeanor and, on conviction thereof in any district court of the United States within whose territorial jurisdiction such offense may have been committed, shall be punished by a fine not exceeding $500, or by imprisonment (in the case of a natural person) not exceeding six months, in the discretion of the court.

within the southeastern Vieques danger zone. Thus, in accordance with 33 C.F.R. § 204.234, the zone was closed to nonmilitary navigation. Sometime in the week prior to January 19th the Navy had announced the practice session in a notice which it customarily published to alert fishermen and sailors of when the zone would be closed for target practice. According to a Government witness, the Navy distributes these notices "to the various agencies." Notice of a target practice is also transmitted daily by radio by the Hydrographic-Topographic Center of the Defense Mapping Agency. And, as was customary, the Navy flew a red warning flag from the top of a pole about thirty feet high located on the crest of Cerro Matias, the highest hill in the eastern half of Vieques.

Nonetheless, at around 9:30 a. m. a flotilla of eleven small boats carrying approximately thirty-five people approached the zone from the west. When the Navy officer responsible for coordinating the target practice learned of the flotilla's approach, he directed a patrol boat to "intercept" the lead boat in the flotilla and advise the occupants that the zone was closed. The patrol boat intercepted the lead boat but the flotilla continued on into the zone. At this point, the Navy suspended the gunnery practice.

After entering the zone the flotilla congregated in the waters of the Bahia Salina del Sur near a ship-to-shore land target. For the next three to four hours they remained just off shore of this target. Soon after the flotilla arrived in the Bahia Salina del Sur, a second patrol boat approached to within hailing distance. A civilian employee of the Navy aboard the patrol boat, with the flotilla now circling around him, informed them by megaphone, in English and Spanish, that they were violating 33 C.F.R. § 204.234 and warned that if they did not depart the zone at once they were subject to criminal prosecution. None of the boats left the area. A contingent of United States deputy marshals stationed on the beach of the Bahia boarded small boats and approached the flotilla in a vain effort to arrest the intruders. As the marshals came near, the members of the flotilla drove them off with lead pellets fired from slingshots; one of the boats of the flotilla also rammed one of the marshals' boats. After this unsuccessful enforcement effort, it appears there were no further clashes and in a few hours the flotilla headed off into the west.[3]

Although the marshals were unable to arrest any of the intruders at the scene, they were able to positively identify through eyewitnesses two of the people aboard boats in the flotilla—Pedro Saade and Carlos Zenon Rodriguez. As a result, Saade and Zenon were subsequently charged by information with violating 33 C.F.R. § 204.234 and 33 U.S.C. § 1.

*Challenge to the Validity of 33 C.F.R. § 204.234*

In one of his several pretrial motions, Saade contended that the information failed to state an offense because, *inter alia,* the danger zone regulation, 33 C.F.R. § 204.234, is invalid. According to Saade, the Secretary of the Army should have promulgated § 204.234 pursuant to 33 U.S.C. § 3,[4] but instead erroneously invoked 33

---

**3.** Evidence in the record, the appellants' presentence statements to the court, and the appellants' brief make it fairly clear that this incident was undertaken as a form of protest against the Navy's presence on Vieques.

**4.** 33 U.S.C. § 3 provides in pertinent part:

In the interest of the national defense, and for the better protection of life and property on the navigable waters of the United States, the Secretary of the Army is authorized and empowered to prescribe such regulations as he may deem best for the use and navigation of any portion or area of the navigable waters of the United States or waters under the jurisdiction of the United States endangered or likely to be endangered by Artillery fire in target practice or otherwise, * * * *Provided,* That the authority conferred shall be so exercised as not unreasonably to interfere with or restrict the food fishing industry, and the regulations prescribed in pursuance hereof shall provide for the use of such waters by food fishermen operating under permits granted by the Department of the Army . . . .

. . . .

U.S.C. § 1 as the appropriate statutory authority. The Government responded by relying on the district court's opinion in *Barcelo v. Brown*, 478 F.Supp. 646 (D.P.R.1979), in which the court held that the regulation was "properly issued and fall[s] within the purview of 33 U.S.C. §§ 1 and 3." *Id.* at 700. Denying Saade's motion to dismiss the information, the trial court treated the challenge as a technical quibble of no consequence, *see* Fed.R.Crim.P. 7(c)(3), and left unaddressed the validity of the regulation. On appeal, the appellants argue that the district court's failure to recognize that § 3, but not § 1, authorizes danger zone regulations effectively foreclosed them from pursuing what would have been a successful defense based upon the requirements of § 3.

In 1894 Congress enacted the original predecessor to the current § 1 of title 33. That provision authorized

the Secretary of War to prescribe such rules and regulations for the use, administration, and navigation of any or all canals and similar works of navigation . . . owned, operated, or maintained by the United States as in his judgment the public necessity may require.

Act of August 18, 1894, c. 299, § 4, 28 Stat. 362. Congress amended the statute in 1902 by expanding the Secretary's power to also include the regulation of

the speed and movement of vessels and other water craft in any public navigable channel which has been improved under authority of Congress, whenever, in his judgment, such regulations are necessary to protect such improved channels from injury, or to prevent interference with the operations of the United States in improving navigable waters or injury to any plant that may be employed in such operations.

Act of June 13, 1902, c. 1079, § 11, 32 Stat. 374. Finally, in 1917 Congress substantially altered the provision, bestowing on the Secretary the apparently more comprehensive authority currently provided for in § 1. Section 7 of the Act of August 18, 1917 made it

the duty of the Secretary of War to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property . . . covering all matters not specifically delegated by law to some other executive department.

C. 49, § 7, 40 Stat. 266. According to the Government, the danger zone regulation unquestionably falls within the responsibility imposed by § 1 on the Secretary to regulate the use and navigation of the navigable waters "for the protection of life and property." *Id.*

If we were to consider § 1 in isolation, we would be inclined to adopt the Government's position, given the sweep of the statutory language. Yet in the same Act of 1917 that created the extant § 1, Congress also enacted a separate provision that specifically authorized the Secretary,

in the interest of the national defense and for the better protection of life and property [,] . . . to prescribe such regulations as he may deem best for the use and navigation of any portion of (sic) areas of the navigable waters of the United States . . . endangered or likely to be endangered by Coast Artillery fire in target practice or otherwise . . . .

Act of August 18, 1917, c. 49, § 8, 40 Stat. 266. Although the Government acknowledges that this section specifically provides the authority for target practice, i. e. danger zone, regulations, it maintains that § 1

The regulations made by the Secretary of the Army pursuant to this section shall be posted in conspicuous and appropriate places, designated by him, for the information of the public; and every person who and every corporation which shall willfully violate any regulations made by the said Secretary pursuant to this section shall be deemed guilty of a misdemeanor, and upon conviction thereof in any court of competent jurisdiction shall be punished by a fine not exceeding $500, or by imprisonment (in the case of a natural person) not exceeding six months, in the discretion of the court.

remains an independent source of authority for such regulations.[5]

Two factors lead us to disagree. First, the contemporaneous enactment of §§ 1 and 3 in a single act strongly evidences that Congress intended that § 3, not § 1, would govern the promulgation of regulations such as 33 C.F.R. § 204.234. To conclude otherwise would render § 3 superfluous, a result we find difficult to accept in the absence of clear evidence that in the one Act Congress intended to enact a redundancy. The unlikelihood of such an irrational design becomes even more apparent in light of the second factor.

In the year after § 3 and the final form of § 1 were adopted, Congress amended § 3, expressly restricting the Secretary's power to prescribe target practice regulations by requiring that the Secretary ensure such regulations do "not unreasonably . . . interfere with or restrict the food fishing industry." Army Appropriation Act for 1919, subc. 19, 40 Stat. 892 (1918). If the Secretary were permitted to proceed under § 1, he could ignore the effect of a regulation on the food fishing industry, circumventing the limited protection of food fishing mandated by the 1918 amendment. Unsurprisingly, the Government offers no evidence from which we can infer that in amending § 3 within one year of the 1917 Act, Congress nonetheless intended that § 1 permit the Secretary to evade the restriction imposed by this amendment.[6] *See United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168–169, 96 S.Ct. 1319, 1322–1323, 47 L.Ed.2d 653 (1976). Thus, the existence of this proviso reinforces our conclusion that § 3 alone authorizes danger zone regulations.[7] This conclusion accords with an elementary principle of statutory construction; a court confronted with competing statutory provisions ordinarily should follow the dictates of the provision more specifically applicable to the problem at hand, *see Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980); *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974), which, in this case, is § 3.

The Government argues that to treat § 3 as the sole legislative authorization for danger zone regulations works an implicit repeal of one facet of § 1, unjustifiably constricting its scope without the clear evidence of congressional approval required to find an implicit repeal. *See, e. g., United States v. United Continental Tuna Corp.*, 425 U.S. at 168–69, 96 S.Ct. at 1322–23; *Morton v. Mancari*, 417 U.S. at 550–51, 94 S.Ct. at 2482–83; *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). But this assumes that § 1 delegates the power to issue danger zone regulations, an assumption we do not accept. Moreover, the Government's argument cuts both ways. If we were to recognize § 1 as an alternative delegation of power to prescribe danger zone regulations, we would nullify § 3, including the limited protection for food fishing. Faced with a choice between merely narrowing the purported purview of § 1 and effectively repealing § 3, we follow the less severe course, thus leaving intact the more exact congressional definition of the Secretary's power.

5. The Government relies on the principle that if more than one criminal statute applies to the conduct in question, the prosecution may elect among those statutes in bringing criminal charges. *See e. g. United States v. Batchelder*, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2203–2204, 60 L.Ed.2d 755 (1979). Only if § 1 authorizes danger zone regulations would this principle possibly apply.

6. In fact if Congress thought that the recently revised § 1 authorized target practice regulation, it is reasonable to assume that § 1 would have been similarly amended.

7. Because these two factors conclusively establish that § 3 alone governs the promulgation of § 204.234, we need not evaluate the appellants' additional arguments drawn from the legislative history of § 1 and a line of cases dealing with claims for compensation for property lost as a result of target practice conducted pursuant to a § 3 regulation. *See Todd v. United States*, 292 F.2d 841, 155 Ct.Cl. 87 (1961); *Jackson v. United States*, 103 F.Supp. 1019, 122 Ct.Cl. 197 (Ct.Cl.1952).

It remains then to consider how this conclusion affects the appellants' convictions. The district court's dismissal of Saade's attack on § 204.234's validity, according to the appellants, short-circuited their defense that the regulation unreasonably interferes with the Viequen food fishing industry and is therefore invalid.[8] The Government advances several reasons for rejecting the appellants' position. First, it contends, without any supporting authority or evidence, that Congress intended that this question be decided only in a civil action. Section 3 is not, however, one part of a unique legislative scheme such as that at issue in *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The statute underlying the controversy in *Yakus* created a comprehensive regulatory administration to control prices during World War II. As part of that scheme, Congress provided an exclusive procedure, including review by an emergency court of appeals, by which an aggrieved party could challenge the validity of a price regulation and expressly prohibited recognition of such a challenge as a defense to a criminal charge for violation of the regulation.[9] *Id.* at 427–29, 64 S.Ct. at 668–70. In the absence of a similarly preclusive legislative scheme applicable to regulations issued pursuant to § 3, we will not foreclose the appellants' efforts to show that their convictions were premised on a regulation that, because invalid, has no legal effect.

■ Second, the Government apparently suggests that because the appellants failed, until appeal, to pursue their claim that the regulation unreasonably restricts fishing, they have waived this defense. Although Saade did not question the reasonableness of the regulation in his pretrial motion, focusing on the Government's erroneous invocation of § 1 as the proper statutory authority, his silence below does not necessarily preclude a fully explored challenge on appeal. Federal Rule of Criminal Procedure 12(b)(2) mandates that a claim that an information fails to state an offense "shall be noticed by the court at any time during the pendency of the proceedings." This language has been interpreted to encompass such defenses even if first raised by a defendant on appeal or by a court of appeals *sua sponte*. *See, e. g., United States v. Meacham*, 626 F.2d 503, 509 (5th Cir. 1980); *Government of Virgin Islands v. Greenidge*, 600 F.2d 437, 439 n.2 (3d Cir. 1979); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). So interpreted, the rule appears to require that we entertain the appellants' claim that the regulation unreasonably interferes with the food fishing industry.

But the Government's final line of defense underscores an important difference between the appellants' challenge and those typically protected by that part of Rule 12(b)(2) cited above. In most cases where a defendant attacks the validity of a statute he allegedly violated, the challenge stands or falls on the analysis of questions of law, often of constitutional dimension. When a criminal defendant questions the validity of a regulation, however, the issue more often is not amenable to resolution without the benefit of fact-findings, as is the case here. The Government argues that target prac-

---

8. The appellants advance as a second defense the alleged failure of the Secretary to designate "conspicuous and appropriate places" on Vieques for public posting of 33 C.F.R. § 204.234. Unlike the food fishing proviso, however, the posting requirement pertains not to the substantive validity of a § 3 regulation but to its enforcement, specifically, the problem of a defendant's knowledge of the regulation. Since the appellants do not claim that they did not have notice of the regulation, there is no reason to decide whether the Secretary fulfilled the posting requirement.

9. Whether a legislative scheme similar in this respect to that sustained in *Yakus* could today withstand a constitutional challenge by a criminal defendant is not settled by *Yakus. See Adamo Wrecking Co. v. United States*, 434 U.S. 275, 279–85, 98 S.Ct. 566, 569–73, 54 L.Ed.2d 538 (1978); *id.* at 289–91, 98 S.Ct. at 575–76 (Powell, J., concurring); *Yakus v. United States*, 321 U.S. at 460–88, 64 S.Ct. at 684–98 (Rutledge, J., dissenting); Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectics*, 66 Harv.L. Rev. 1362 (1953).

tice conducted in accordance with § 204.234 does not unreasonably interfere with the food fishing industry of Vieques. But neither party adduced evidence at trial on this question and thus the district court did not provide us with any pertinent findings. Without knowing how in fact the Navy's target practice hinders fishing in the Viequen waters, if at all, we cannot decide whether that practice is reasonable under § 3.[10] Thus, if we recognize the appellants' belated challenge, we have no choice but to remand the case to the district court, a prospect that causes us to hesitate. What concerns us is that Rule 12(b)(2), so applied, opens the way for defendants in this situation to remain silent until appeal, knowing they can gain at least some delay and further burden the Government through a remand to the trial court for the fact-findings necessary to determine a regulation's validity. Having expressed our concern, we nevertheless conclude that under the facts of this case the appellants' challenge should be recognized.

■ Although Saade did not question the regulation's compliance with the fishing proviso before the district court, he did draw the court's attention to a potentially substantial defect in the promulgation of the regulation, the Secretary's misplaced reliance on 33 U.S.C. § 1. Given the Secretary's error, and that a facially apparent major distinction between § 1 and § 3 is the latter's proviso for the food fishing industry, the district court had an obligation to ascertain whether the Secretary had complied with the proviso when issuing the regulation.[11] This obligation arises from the fact that a federal court has jurisdiction to try criminal cases only when the information or indictment alleges a violation of a valid federal law; and it is ultimately the court's responsibility to ensure that jurisdiction exists. Confronted with a potentially significant anomaly in the promulgation of the regulation, the validity of which is essential to its jurisdiction, the district court should have inquired further, regardless of the inadequacy of the defendant's motion.

■ Thus, we remand the case for further proceedings to determine whether 33 C.F.R. § 204.234 unreasonably interferes with the food fishing industry.[12] If the district court rules that the danger zone regulation complies with the fishing proviso, the convictions shall stand. If the court rules to the contrary, it shall dismiss the informations.

Although we remand the case, we consider it appropriate to review the other grounds raised by the appellants so that any subsequent appellate review of these convictions, if necessary, will be limited to the question upon which we now remand.[13]

10. As explained by this court in *Romero-Barcelo v. Brown*, 643 F.2d 835 at 851–52 (1st Cir. 1981), the district court in *Barcelo v. Brown*, 478 F.Supp. 646, 700 (D.P.R.1979), did not rule on whether 33 C.F.R. § 204.234 complies with the food fishing proviso.

11. Nor can we tell from the materials available to us whether the Secretary actually attempted to comply with the food fishing proviso. When the regulation was formally proposed, the Secretary cited both §§ 1 and 3 as the statutory authority. 39 Fed.Reg. 13889 (1974). Following the period allowed for public comment, however, when the Secretary published the regulation as final he relied solely on § 1. 39 Fed.Reg. 27133 (1974).

12. Though we initially presume the validity of an administrative regulation, that presumption does not preclude this inquiry in the face of the Secretary's erroneous reliance on § 1. It does, however, place the ultimate burden of proof on the appellants because the regulation at least

facially conforms with the proper legislative source of the Secretary's authority, § 3. *See, e. g., Merchants National Bank v. United States*, 583 F.2d 19, 22 (1st Cir. 1978).

In making this determination, the court itself, not a jury, should decide any relevant issues of fact. The standard to be applied is whether the agency action, in light of the facts presented, is arbitrary, capricious or an abuse of discretion. And, the agency should be notified so that it may defend its regulation. *See generally* Nathanson, *Probing the Mind of the Administrator: Hearing Variations and Standards of Judicial Review Under the Administrative Procedure Act and Other Federal Statutes*, 75 Colum. L.Rev. 721, 755 & n.172 (1975).

13. The appellants also contend that the regulation is invalid because it is "designed" to protect illegal activity, i. e., the Navy's target practice. According to the appellants, the Navy unlawfully transferred this activity from Culebra to Vieques in violation of various congres-

## Invidious Selective Prosecution

Before trial, Saade moved to dismiss the information because the Government supposedly had singled out Zenon and Saade for prosecution in order to deter their exercise of rights protected by the first amendment. In the alternative, Saade requested an evidentiary hearing to explore his claim. The Government of course opposed the motion and the district court refused to conduct a hearing and denied the motion to dismiss. The appellants challenge that ruling.

 When considering an attack on the Government's exercise of its broad discretion in the decision whether to prosecute a particular case, we presume that that choice has been made in good faith for reasons of sound governmental policy. *See United States v. Lichenstein*, 610 F.2d 1272, 1281 & n.4 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *United States v. Union Nacional de Trabajadores*, 576 F.2d 388, 395 (1st Cir. 1978). To overcome this presumption, defendants bear a heavy burden. Only if a defendant can establish *prima facie*

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights[,]

sional and presidential directives. Assuming the appellants may raise this issue in their defense, it gains them nothing. When we recently held in another decision that the statutes and executive directives applicable to this question do not imply a private cause of action, we based that ruling on our conclusion that there were no judicially cognizable standards by which to adjudicate the lawfulness of the alleged transfer of training activities. *Romero-Barcelo v. Brown*, 643 F.2d at 840–51. The appellants present no new information or theory to warrant a different conclusion now.

does the burden shift to the government to demonstrate that the prosecution was not premised on an invidious objective. *United States v. Union Nacional de Trabajadores*, 576 F.2d at 395, *quoting United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974). A defendant need not, however, present a *prima facie* case in order to justify an evidentiary hearing. So long as the defendant alleges some facts a) tending to show that he has been selectively prosecuted, and b) raising a reasonable doubt about the propriety of the prosecution's purpose, *see United States v. Larson*, 612 F.2d 1301, 1304–05 (8th Cir.), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *United States v. Berrios*, 501 F.2d at 1211–12 & n.4; *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (in banc), a district court, in the absence of countervailing reasons, should grant a request for a hearing.

Saade's claim of invidious selective prosecution drew essentially upon two factual allegations contained in his motion. First, he asserted that of the "numerous persons" who participated in the January 19th protest action and similar earlier protests, only two, Saade and Zenon, were arrested for violation of 33 C.F.R. § 204.234. Second, he alleged a) that Zenon is the prominent president of the Vieques Fishermen's Association and active in the movement opposed to the use of Vieques as a Navy training area, and b) that Saade is the attorney for both Zenon and the Association and also actively participates in the opposition to the Navy's activities on Vieques. According to Saade, these two allegations conclusively show that the Government prosecuted the appellants to halt future political action against Navy training operations and to punish the appel-

The appellants' closely related contention that this court has declared the target practice illegal is also without merit. In *Romero-Barcelo v. Brown*, we ordered the district court to enjoin an incident of the target practice, not the practice itself. At 861–62. Our holding that the Navy must refrain from discharging shells and other firing refuse into the coastal waters of Vieques until it obtains a NPDES permit is a far cry from a general declaration that the target practice is unlawful.

lants for past political activities, contrary to the first amendment. In response, the government submitted a memorandum stating, *inter alia*, that Saade and Zenon were the only ones charged with violating 33 C.F.R. § 204.234 because, out of the approximately thirty-five persons who took part in the January 19th protest, only appellants could be identified without the Government undertaking an extensive investigation. According to the Government, if at the time of the protest the United States marshals could have safely arrested the others, they too would have been charged with violating the danger zone regulation. On the basis of these unsworn allegations from both parties, the district court refused to grant a hearing or dismiss the information.

Standing alone, Saade's allegations suggest a striking coincidence that arguably casts a reasonable doubt on the propriety of the Government's design in pursuing the prosecution of the appellants only, thus warranting an evidentiary hearing. But the Government parried these allegations with concrete, legitimate reasons that were subsequently supported in full by evidence adduced at the trial. The district court also may have considered that the Government, in an effort to husband its limited prosecutorial resources, chose to prosecute only those who could be easily apprehended in the hope that prosecution of the appellants would deter future illegal disruptions of Navy training practice.[14] Unlike the situation in *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), where the Government defended its selective prosecution with nothing more than a bland

invocation of "prosecutorial discretion," *id.* at 1152; *cf. United States v. Falk*, 479 F.2d at 623 (defendant's extensive factual allegations "unrebutted" by the Government),[15] here the Government came forth with a specific explanation for its decision to prosecute only Saade and Zenon that is well within the wide range of factors the Government may permissibly consider in deciding whether to prosecute. Thus, under these facts the district court did not abuse its discretion in denying Saade's motion in its entirety.

*Allegation of Unlawful Electronic Surveillance*

In a comprehensive pretrial motion, Saade requested that the trial court order the Government to disclose whether the Government had conducted any form of electronic surveillance of Saade's telephone conversations. Saade supported the motion with an affidavit in which he briefly described his frequent use of three telephones in the course of his work as a lawyer for Puerto Rico Legal Services. He asserted that since March 1979 his telephone conversations with clients and other lawyers were disturbed by "irregularities", specifically, "unusual sounds, voices of other people not related with the telephone I am calling." Finally, he expressed his belief that the irregularities evidenced electronic surveillance. Initially, the district court granted Saade's motion. But upon reconsideration at the request of the Government the court vacated its first order and denied the motion.[16]

---

**14.** Assuming the prosecution also concluded, as asserted on appeal, that the appellants' political prominence would fortify the potential deterrent effect, we find nothing evil in this calculation. *See United States v. Catlett*, 584 F.2d 864, 867–68 (8th Cir. 1978); *United States v. Ojala*, 544 F.2d 940, 944–45 (8th Cir. 1976). Although the deterrence rationale can always be invoked to justify selective prosecution, its general applicability does not undermine its legitimacy in the absence of evidence that controverts the Government's asserted interest in deterrence of the criminal conduct at issue.

**15.** In their reliance on *Steele* and *Falk*, the appellants ignore that not only did the Govern-

ment offer nothing concrete to justify the selective prosecution in those cases, but *Steele* and *Falk* presented far more compelling allegations than have the appellants.

**16.** Zenon submitted neither a motion to compel disclosure of electronic surveillance nor an affidavit alleging facts evidencing the existence of unlawful wire-tapping. Nor did he attempt to join in Saade's motion. Thus, for him to successfully challenge the district court's ruling we would have to find that the court committed plain error. *See United States v. Previte*, 648 F.2d 73, 83 (1st Cir. 1981); *McMillen v. United States*, 386 F.2d 29, 35 (1st Cir. 1967); Fed.R. Crim.P. 52(b). Given our disposition of

Saade's claim on appeal is two-fold. First, he contends that his fourth amendment rights may have been violated by the use of evidence obtained through illegal wiretapping. Second, he questions whether his and his clients' sixth amendment rights to effective assistance of attorney-client conversations may have been impaired by illegal surveillance of attorney-client conversations. We consider these issues separately.[17]

■ Under 18 U.S.C. § 3504(a)(1), when a "party aggrieved" claims that evidence that may be used against him is tainted by illegal wiretapping, the Government must "affirm or deny the occurrence of the alleged unlawful act." *Id.*[18] Saade maintains that his affidavit stated a claim which triggered the Government's duty under § 3504(a)(1). But whether or not the district court should have recognized Saade's allegations as a claim,[19] no harm befell the appellants from the denial of the motion. Our review of the record convinces us that none "of the evidence used to convict appellants could have been the fruit of wiretap-

ping." *United States v. Union Nacional de Trabajadores,* 576 F.2d at 393. As was the case in *Union Nacional,* the conduct for which the appellants were convicted "was out in the open for all to see," *id.;* the Government's case consisted of eye-witness testimony by military officers and government agents and undisputed documentary evidence. We find completely unpersuasive the appellants' attempt to explain how this evidence could have been tainted by illegal wiretapping.

■ The sixth amendment facet of Saade's claim fails for a different reason. In his affidavit accompanying his motion, Saade expressed his belief that the alleged wiretapping was "in connection with" his "representation of the Viequens and my arrest on January 19, 1980," and alleged that he had "engaged in conversations of confidential nature with my clients in Vieques and with other lawyers and people that are working in Vieques too." Assuming that a defendant may draw from the sixth amendment a right analogous to that created by § 3504(a)(1),[20] *see Union Nacion-*

Saade's challenge, we do not reach this question.

**17.** The appellants' counsel, who find considerable support for their position in an unpublished opinion of this Court, would be well advised to consult First Circuit Rule 14.

**18.** 18 U.S.C. § 3504 provides in pertinent part:
(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—
(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;
 \* \* \* \* \* \*
(b) As used in this section "unlawful act" means any act [*sic*] the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.

**19.** As to what constitutes a "claim" for purposes of 18 U.S.C. § 3504(a)(1), *compare, e. g., United States v. Toscanino,* 500 F.2d 267, 281

(2d Cir. 1974), *and In re Evans,* 452 F.2d 1239, 1247 (D.C.Cir.1971), *with United States v. Gardner,* 611 F.2d 770, 774 (9th Cir. 1980), *and United States v. See,* 505 F.2d 845, 856 (9th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975), *with In re Archuleta,* 561 F.2d 1059, 1062 (2d Cir. 1977), *and United States v. Yanagita,* 552 F.2d 940, 943 (2d Cir. 1977). Those courts presented with allegations similar to Saade's have doubted that they form an actionable claim. *See In re Archuleta,* 561 F.2d at 1062: *In re Vigil,* 524 F.2d 209, 214 (10th Cir. 1975), *cert. denied,* 425 U.S. 927, 96 S.Ct. 1526, 47 L.Ed.2d 170 (1976). Because many of the decisions of this question arise in the context of a contempt proceeding against a grand jury witness, the somewhat different considerations implicated by a criminal defendant's claim may warrant a lower threshold for triggering the Government's duty under § 3504(a)(1). *Cf. In re Millow,* 529 F.2d 770, 774 (2d Cir. 1976) (policy concerns applicable to grand jury context). *But see United States v. James,* 609 F.2d 36, 51 (2d Cir. 1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

**20.** 18 U.S.C. § 3504(a)(1) pertains only to challenges against the use of tainted evidence. *See* note 17 *supra.*

*al*, 576 F.2d at 394, these allegations fail to raise a sixth amendment claim related to the criminal prosecution at issue here.[21] Rather, the allegations appear to seek a wholesale disclosure of possible electronic surveillance of Saade with respect to his work generally on behalf of the Vieques Fishermen's Association and other Viequen clients, including Zenon.[22] Although that work may be ideologically related to the immediate events that led to the appellants' convictions, that connection alone does not suffice to raise a viable sixth amendment-based claim in the context of a criminal case.

 As applied to a criminal defendant's "claim," § 3504(a)(1) works within the limits of a criminal prosecution, offering some protection to a defendant from a conviction secured through tainted evidence. So too a sixth amendment analogue to this statutory right should be confined to protecting an individual's right to the effective assistance of counsel in defending against a criminal charge. Thus, for such a claim to survive, the affidavit must allege facts tending to show that conversations between a defendant and the attorney defending him against the criminal charge, or conversations of the defendant or his attorney with third persons pertaining to that defense, have been wiretapped. Where the allegedly overheard conversations were between the attorney or the defendant and third parties, the allegations should set forth the dates of the pertinent conversations, the identities of the third persons and the connection between those conversations and the defense of the criminal charge. *See, e. g., United States v. Vielguth*, 502 F.2d 1257, 1259–60 (9th Cir. 1974); *United States v. Alter*, 482 F.2d 1016, 1026 (9th Cir. 1973). Saade failed to allege facts sufficient to support even a colorable claim that the Government tapped either conversations between him and the attorney who represented him in this case or conversations between him or that attorney and third persons that were directly related to Saade's defense of this charge.

The district court properly denied Saade's motion to compel disclosure of electronic surveillance.

 The remaining issues raised by Saade and Zenon require only brief discussion. The appellants contend that in sentencing them both to the maximum term of six months imprisonment, the district court acted without regard to them as individuals and relied on "impermissible" factors. As we have previously emphasized, "a court of appeals may not reverse or tamper with a sentence that is within legal limits," *United States v. Foss*, 501 F.2d 522, 527 (1st Cir. 1974), unless the record shows that the trial court relied on an "improper" assumption, *United States v. Wardlaw*, 576 F.2d 932, 937 (1st Cir. 1978), or followed a " 'mechanistic' concept of what a particular type of crime invariably deserves," blind to any "mitigating factors" applicable to the individual defendant's case. *United States v. Foss*, 501 F.2d at 527; *see Dorszynski v. United States*, 418 U.S. 424, 443, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855 (1974); *United States v. Wardlaw*, 576 F.2d at 938; *United States v. Hartford*, 489 F.2d 652, 655 (5th Cir. 1974). Neither the appellants' argument on appeal, nor our review of the record, discloses any evidence that the district court acted mechanistically in determining their sentences. The record shows only that the court offered the appellants an opportunity to inform it of potentially ameliorative factors: both of the appellants accepted this invitation with a brief account of the political impetus for the January 19th incident. Finally, the appellants cannot be heard for the first time on appeal to complain because the court reasonably decided to forego preparation of presentence reports. *See* Fed.R. Crim.P. 32(c).

**21.** Saade's pretrial memorandum and appellate brief attempt to flesh out the nature of the sixth amendment facet to his motion to compel disclosure. But these efforts can be fruitful only if the required affidavit contains sufficient factual allegations upon which to build an argument.

**22.** The wholesale nature of Saade's allegations is further evidenced by the fact that Saade's affidavit refers to irregularities during conversations that occurred as early as ten months before the January 19th incident.

The appellants also claim that in determining the sentences the court impermissibly relied on a Government witness' testimony as to newspaper reports of Zenon's public statements related to the planning of the January 19th protest action. Not only, in light of the record, is this conjecture, but the appellants fail to recognize that in deciding upon the appropriate sentence a trial court properly may consider "responsible unsworn or 'out-of-court' information relative to the circumstances of the crime . . . ." *Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959).[23] If the trial court did consider this specific information in sentencing the appellants, it acted within its discretion.

Saade and Zenon assail their convictions on the ground that the Government failed to prove they knew the Navy was conducting target practice at the time they entered the danger zone.[24] Much of this argument is directed against the grounds articulated by the district court in its findings, in particular, its supposedly considerable reliance on inadmissible testimony that related statements of Zenon as reported by several newspapers. *See* note 23 *supra*. Although we think the appellants exaggerate the importance of this evidence to the court's findings, even if it were entirely disregarded the other evidence of the appellants' knowledge is substantial. Sometime in the week preceding January 19th the Navy had routinely distributed a notice of the practice schedule; the Defense Mapping Agency had transmitted the information as part of its daily radio broadcasts for the benefit of local sailors and fishermen; a red warning flag, routinely used to alert fishermen and sailors of a target practice, flew atop the highest point on the eastern half of the island; a patrol boat intercepted the flotilla before it entered the zone and, it may be inferred, warned the lead boat not to enter because of the gunnery practice; and another patrol boat warned them that they were in violation of the danger zone regulation after they had entered the zone—they still did not leave for approximately three hours.[25] Considering this evidence, and all reasonable inferences, in the light most favorable to the Government, we conclude that the evidence as a whole sufficiently supports the trial court's finding that the appellants knew the zone was closed to nonmilitary navigation before they entered it.[26]

For the reasons stated, we remand the case to the district court for further proceedings consistent with this opinion.

*Remanded.*

LEVIN H. CAMPBELL, Circuit Judge (concurring and dissenting).

The regulation should, I agree, have been promulgated under 33 U.S.C. § 3, not section 1. It does not follow, however, that defendants are entitled to a remand, for the purpose of an evidentiary hearing on a factual issue they never raised before the district court—namely, whether the regulation constituted an unreasonable interference with the food fishing industry.

Defendants' pre-trial motion only claimed that the information failed to state an offense because the regulation they were charged with violating was invalid, having been expressly promulgated under section 1, not section 3, of Title 33. The district court properly denied the motion. As this court in effect holds, citation to an inappo-

---

**23.** Moreover, although the appellants correctly characterize this testimony as a double hearsay account of what may have been admissible admissions of Zenon, they failed to object to the introduction of this testimony during the trial. Thus the testimony was part of the record before the district court.

**24.** The appellants do not question the court's finding that they knew of the regulation at the time they entered the zone.

**25.** Although this warning was given after the appellants entered the zone, it remains relevant to show their knowledge prior to entry. A person who was ignorant of the target practice when they entered the zone would be unlikely to remain once warned, flouting the instructions of government personnel.

**26.** We see no reason to review the appellants' belated claim that the assistant United States Attorney, whom the defense called as a witness, should have been disqualified from serving as the Government's counsel.

site enabling statute is not a sufficient reason to invalidate an information where authority for the challenged regulation exists in another statute. *See Johnson v. United States*, 206 F.2d 806, 807, 14 Alaska 380 (9th Cir. 1953).

At no time below did defendants advance the further and distinct proposition that the information was invalid because the regulation did not comply with the proviso in section 3 that a regulation thereunder must not interfere unreasonably with the food fishing industry. Nothing on the face of the regulation gives rise to such a claim. There was nothing whatever to prevent defendants from making this claim in the district court had they wished to do so. To be sure, the judge might have overruled such a claim, had it been made, on one or another ground, including, possibly, the mistaken ground that section 1 applied, and that no such proviso existed in section 1. But the court might not have adopted this approach. We shall never know. In any event, litigants are not excused from presenting matters in the trial court simply because they believe the judge will deny their request. Surely if defendants here had any real belief that the regulation could be shown to interfere with food fishing, they would have made the point in their motion and extensive supporting brief filed in the district court. They did not. I am therefore at a loss to understand why we permit them to raise the matter at this juncture. The question was, indeed, not even raised in their appellate brief. It first surfaced during oral argument before this court.

Citation to Fed.R.Crim.P. 12(b)(2) is not, I think, an adequate explanation of the court's result. An indictment may be challenged for the first time on appeal under Rule 12(b)(2) where it omits a necessary element of the crime charged, *see Walker v. United States*, 342 F.2d 22 (5th Cir.), *cert. denied*, 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965); where it charges a defendant with a crime that does not exist under the statute, *see United States v. Meacham*, 626 F.2d 503 (5th Cir. 1980); *Government of Virgin Islands v. Greenidge*, 600 F.2d 437 (3d Cir. 1979); or where the

statute creating the offense is unconstitutional, *see United States v. Seuss*, 474 F.2d 385 (1st Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). It may even be the case that a challenge to the validity of a regulation may be raised for the first time on appeal if an adequate basis for decision is to be found in the appellate record. *See Johnson*, 206 F.2d 806. But I have found no case in which Rule 12(b)(2) has been invoked to allow a defendant to raise for the first time on appeal such factual and wholly undeveloped issues as are at stake here. Moreover, I have found no case in which the issue of an indictment's failure to state an offense has been remanded to the district court. This is but further illustration of the point that under Rule 12(b)(2) issues requiring extensive factual development may not be raised for the first time on appeal. If this sort of procedure is to be allowed, litigants will not only be encouraged to save up ammunition for *de novo* use in the appellate court, but already overburdened courts will end up holding double hearings at the expense of other litigants whose claims have yet to be heard at all.

I would affirm the judgment below.