685 A.2d 839

**Anthony Dorvell McNEIL**

**v.**

**STATE of Maryland.**

**No. 173, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Dec. 3, 1996.

438

George Harper, Upper Marlboro, for Appellant.

Diane Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Jack B. Johnson, State's Attorney for Prince George's County, Upper Marlboro, on the brief), for Appellee.

Argued before FISCHER, HOLLANDER and EYLER, JJ.

HOLLANDER, Judge.

In this appeal, we shall construe Maryland Code, Courts and Judicial Proceedings Article ("C.J.") § 12–302(c)(3) (1957, 1996 Repl.Vol.), which permits the State to lodge an interlocutory appeal challenging a trial court's suppression of evidence. Anthony McNeil, appellant, was charged with armed robbery and attempted murder. When the Circuit Court for Prince George's County granted appellant's motion to suppress his confession, the State noted an appeal. After the State sought to withdraw its appeal, the case proceeded to trial. A jury convicted McNeil of attempted second degree murder and armed robbery, for which he was sentenced to a total of 40 years imprisonment. On appeal, McNeil presents the following questions:

I.   Does the State's abandonment of an interlocutory appeal require dismissal of the underlying prosecution?

II.   Does the State's abandonment of an interlocutory appeal require exclusion of any evidence acquired during the pendency of that appeal?

III.   Does a trial court lack jurisdiction to try a criminal case while a State's interlocutory appeal is pending, under C.J. 12–302?

IV. Did the trial court deny the defendant his rights to confront and cross examine the witnesses against him, by improperly limiting his cross-examination?

For the reasons that follow, we shall remand for further proceedings concerning the first and second questions. We shall answer the remaining questions in the negative.

## Factual Summary

Anthony McNeil and Blaise McNeil [1] were charged with the armed robbery and attempted murder of Pamela Mills. The State alleged that, on May 10, 1994, the two men stole money and drugs from the townhouse shared by Mills and her boyfriend and, during the robbery, McNeil shot Mills three times.

On September 22, 1995, the court held a hearing on McNeil's motion to suppress his confession. The court granted the motion, concluding that the confession was "tainted" by police questioning before McNeil was advised of his constitutional rights. Trial was rescheduled for September 27, 1995. On that date, the State noted an appeal from the suppression order, pursuant to C.J. § 12–302(c)(3). In accordance with the statutory requirements, it certified that the appeal was not taken for purposes of delay and that the confession was material to the case. The State never paid the filing fee for the appeal, however.[2]

Also on September 27, 1995, the State moved to continue the trial and, because of the appeal, asked the court to find good cause for the postponement.[3] The court (Missouri, J.)

---

1. The co-defendants are not related. For clarity, we shall refer to Blaise McNeil as "Blaise."

2. By letter dated October 26, 1995, the clerk of the circuit court advised the State that this Court would not accept the record unless the State paid the fee by November 26, 1995.

3. A criminal defendant has the right to be tried within 180 days of the earlier of the appearance of counsel or the defendant's first appearance in court. The 180 day limit may be exceeded for "good cause". Code,

granted the continuance, but declined to find good cause for the postponement. Instead, the court instructed counsel to obtain a new trial date consistent with statutory speedy trial requirements, and noted that "if the Court of Special Appeals is still tied up with the case, at that time then I will consider granting good cause...." Consistent with the court's instructions, trial was rescheduled for November 6, 1995. On that date, Blaise pleaded guilty to assault with intent to murder. McNeil's case was "trailed" until November 7th, apparently because his lawyer was involved in another matter.

On November 7, 1995, the court (McKee, J.) advised McNeil that he had received from the prosecutor a notice to withdraw the State's appeal. McNeil objected, asserting that the State had improperly attempted to dismiss the appeal under Md. Rule 8–203(a) and that, in any event, the State could not dismiss an appeal taken under C.J. § 12–302(c)(3). As the appeal was still pending, he also contended that the court did not have jurisdiction to try the case. The following colloquy is relevant:

COURT: The record should indicate that just moments ago the State handed to me a notice of withdrawal of appeal pursuant to Rule 8–203(a) and it's accepted by the Court. DEFENSE COUNSEL: Your Honor, that rule is not the correct rule. That is the rule for striking of a notice of appeal by the court.

Now, 8–601, that being Maryland 8–601 does appear on [sic] an appellant to dismiss appeal at any time before an opinion of the court is announced by filing a notice of dismissal. But it specifies that it must be filed in the Court of Special Appeals and then a copy must be placed in the court file in the Circuit Court, if the Circuit Court still has possession of the file.

---

Article 27, § 591 (1957, 1994 Repl.Vol.); Md. Rule 4–271. If the date of trial is extended beyond the 180 days, and good cause is not shown, the charges against the defendant must be dismissed. *State v. Hicks,* 285 Md. 310, 403 A.2d 356 (1979). McNeil's original "Hicks" date was December 11, 1995.

I point that out because the Court right now doesn't have the jurisdiction to try this case until the State actually files it in the Court of Special Appeals. And that has two consequences.

COURT: You walk downstairs to the resident appellant [sic] judge's chambers and a fellow down there known as Judge Chasanow, then you would have filed it with the Court of Appeals.

THE STATE: The State will do that.

COURT: And you're going to do that.

McNeil further asserted that the State had taken the appeal in bad faith, in order to delay the trial and gather evidence against him. Additionally, he complained that he was not prepared for trial because he had anticipated a good cause hearing, and not a trial, on November 6, 1995. Consequently, McNeil moved to dismiss the case or exclude evidence that the State had obtained during the pendency of the appeal.

In response, the prosecutor, Lloyd Johnson, explained that Kenneth Eichner, the prosecutor who had handled the suppression hearing, had resigned from the State's Attorney's office, and McNeil's case had been reassigned to him. Johnson denied any "bad faith" by the State and said that he decided to withdraw the appeal after reviewing the file and determining that the appeal would be "counter productive". He also claimed that the filing of the appeal did not preclude the State from continuing its investigation. The court denied McNeil's motion, and the case was reset for trial the next day. A docket entry for November 7, 1995 indicates: "Notice withdrawing the appeal to be filed by the State."

That same day, the police reinterviewed Wayne Bishop, a special police officer in the District of Columbia, who was the fiance of McNeil's sister.[4] Bishop had previously told police that he had accepted a shotgun as a gift from McNeil on the night of the robbery, but that he did not know anything about

---

4. The record does not reveal whether the second interview of Bishop took place before or after the hearing before Judge McKee.

the robbery. During the second interview, which the prosecutor attended, a police detective told Bishop that he could either talk or he would be "read his rights". Bishop gave the police a second statement in which he said that McNeil and Blaise had confessed to him that they had shot a woman, and that he had seen them with a woman's purse and a large sum of money at his home.

On November 8, 1995, the State filed in the circuit court a Notice of Withdrawal of Appeal. The notice, captioned "IN THE MARYLAND COURT OF SPECIAL APPEALS," requested that the State's appeal be stricken. On the same day, the court (Spellbring, J.) heard additional argument concerning McNeil's objections to the State's effort to withdraw the appeal. McNeil also formally filed a Motion for Appropriate Relief, alleging, *inter alia,* that it would be contrary to public policy to permit the State to benefit from its abuse of C.J. § 12–302(c)(3). Appellant conceded that the statute seems to permit the State to continue its investigation during the pendency of the appeal. But, if the State is permitted voluntarily to withdraw an appeal, he reasoned that its decision might turn on the result of its investigation, effectively encouraging the State to be dilatory in pursuing the appeal, which the statute clearly prohibits.

McNeil argued that the following facts established the State's bad faith: 1) the State never paid the filing fee for the appeal; 2) three days after the appeal was filed, the State subpoenaed at least one witness, Bishop, for the November 7, 1995 court date, evidencing its intent not to pursue the appeal; 3) the State used the delay to obtain evidence against him; 4) the State failed to advise appellant of its intention to abandon the appeal prior to the court date of November 7th; and 5) the prosecutor participated in the interview in which Bishop was told he could either talk or have his "rights read". The defense requested the following relief:

A. Hold a full evidentiary hearing upon this motion, with testimony from all participants, such as Kenneth Eichner, Esq., Lloyd Johnson, Esq., Vickie Janof, Appeals Clerk, and Linda Anderson, Court Reporter;

B.   Continue trial herein until such an evidentiary hearing can be held;

C.   Exclude from any subsequent trial any of the evidence gained by the State since the filing of the interlocutory appeal;

D.   Dismiss the instant matter for prosecutorial misconduct.

The State responded that November 6, 1995 was intended as a trial date. The prosecutor submitted an inter-office memorandum to the court, authored by Eichner, dated October 5, 1995, which noted that the C.J. § 12–302(c)(3) appeal had been filed, but did not indicate that the November 6, 1995 date was for any purpose other than trial. Again, McNeil's motion was denied. The court said:

I will deny the defense motion to continue this trial date. I will not consider the motion for appropriate relief ... and the supplemental memorandum in support of a motion for appropriate relief on the basis, I believe, these issues have already been handled by Judge McKee on November 7. ... I will deny having any further good cause hearing other than what has already been held placed [sic] on the record before Judge McKee and me.[5]

McNeil's trial began on November 8, 1995, and he was convicted on November 14, 1995. On the same day, this Court issued its mandate with respect to the State's appeal, which said:

JUDGMENT: November 7, 1995:  Notice of Withdrawal of Appeal filed by counsel for appellant.  Appeal dismissed.

November 14, 1995:  Mandate issued.

On November 22, 1995, McNeil moved for a new trial, again alleging that the State abused C.J. § 12–302(c)(3) by not diligently pursuing the appeal and by taking the appeal for the purpose of delay. He also asserted that the prosecutor lacked

---

5.  We observe that the court's decision regarding the request for continuance is not before us, because it has not been raised on appeal.

authority to withdraw the appeal, because only the Attorney General has the power to do so under the Maryland Constitution. Additionally, he contended that the circuit court lacked jurisdiction to try McNeil, because this Court had not yet issued its mandate for the appeal. On November 28, 1995, McNeil also filed a motion to dismiss the indictment, claiming that the withdrawal of the appeal rendered final the issue on appeal, and the mandate from this Court constituted an affirmance of the suppression order. The State countered that McNeil's allegation that the State pursued the appeal in bad faith was "unsubstantiated."

At sentencing, the court considered McNeil's post-trial motions. The parties submitted a Stipulation, stating that if Eichner were called to testify, he would say that, when he "filed the appeal, he never intended to put Anthony McNeil to trial until the interlocutory appeal had been decided", and that the court date of November 6, 1995 was intended as a trial date only if this Court had by then decided the appeal.

The trial court rejected McNeil's argument that the prosecutor lacked authority to withdraw the appeal. It also concluded that the issuance of the mandate was not necessary to vest the trial court with jurisdiction, because the State had voluntarily dismissed its appeal. Further, the court determined that, because the appeal only challenged the suppression order, the trial court retained jurisdiction over the remainder of the case. With respect to the attack on the State's good faith, the court stated: "I don't find that the record supports factually the arguments made by the defense, and at this point and for that reason, I will deny the motion for new trial on that point." The court also denied the motion to dismiss the indictment, ruling that C.J. § 12–302(c)(3) required the State to dismiss the charges against McNeil only if an appellate court affirmed the suppression order, not if the State withdrew its appeal.

We shall include additional facts in our discussion of the issues.

## Discussion

### I.

At common law, the State did not have a right to appeal an order granting a defendant's motion to suppress evidence.[6] *Lohss v. State,* 272 Md. 113, 117, 321 A.2d 534 (1974); *State v. Barshack,* 197 Md. 543, 80 A.2d 32 (1951); *State v. Adams,* 196 Md. 341, 76 A.2d 575 (1950). Generally, any right to appeal that the State enjoys is grounded in a statutory provision. *Adams,* 196 Md. at 347–49, 76 A.2d 575.

Prior to 1982, the State had no statutory right to appeal a suppression order, because such orders are not final judgments.[7] *State v. Bailey,* 289 Md. 143, 148, 422 A.2d 1021 (1980) (citing *Neal v. State,* 272 Md. 323, 324–25, 322 A.2d 887 (1974); *Pearlman v. State,* 226 Md. 67, 70, 172 A.2d 395 (1961)). In 1982, however, the General Assembly enacted C.J. § 12–302(c)(3), which authorizes an interlocutory appeal of a suppression order under certain circumstances. While the statute provides a mechanism by which the State may obtain prompt appellate review of a trial court's decision to suppress evidence, it does not address whether the State may withdraw an appeal. Therefore, we must resolve whether the State may withdraw an interlocutory appeal and, if so, under what circumstances.

The statute provides:

(i) In a case involving a crime of violence as defined in § 643B of Article 27, and in cases under §§ 286 and 286A of Article 27, the State may appeal from a decision of a trial court that excludes evidence offered by the State or re-

---

**6.** An exception to the rule existed if the court lacked subject matter jurisdiction. *See Cardinell v. State,* 335 Md. 381, 644 A.2d 11 (1994) (finding that the State had a common law right to appeal a trial court's decision when the trial court did not have jurisdiction to decrease the defendant's sentence).

**7.** The State did, however, enjoy a right to appeal orders dismissing an indictment. Code, C.J. § 12–302 (1974); Md.Code, Article 5, § 14 (1957). But, this right did not extend to the appeal of suppression orders. *State v. Mather,* 7 Md.App. 549, 256 A.2d 532 (1969).

quires the return of property alleged to have been seized in violation of the Constitution of the United States, the Constitution of Maryland, or the Maryland Declaration of Rights.

(ii) The appeal shall be made before jeopardy attaches to the defendant. **However, in all cases the appeal shall be taken no more than 15 days after the decision has been rendered and shall be diligently prosecuted.**

(iii) **Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay** and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

(iv) If the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

(v) Pending the prosecution and determination of an appeal taken under paragraph (1) or (3) of this subsection, the defendant shall be released on personal recognizance bail. If the defendant fails to appear as required by the terms of the recognizance bail, the trial court shall subject the defendant to the penalties provided in Article 27, § 12B.

(vi) If the State loses the appeal, the jurisdiction shall pay all the costs related to the appeal, including reasonable attorney fees incurred by the defendant as a result of the appeal.

McNeil contends that the State may not withdraw its appeal under C.J. § 12–302(c)(3), because the statute does not expressly authorize the State to do so. He argues that the restrictions that govern the appeal and the adverse conse-

quences to the State that follow an unsuccessful appeal establish the Legislature's intent to discourage the State from taking an appeal, in the absence of extreme circumstances. He further argues that the State's withdrawal evidences that it improperly appealed to obtain a delay, so that it could use the delay to gather additional incriminating evidence against him. The State counters that Maryland Rule 8–601 allows the State to dismiss an appeal any time before the appellate court issues its decision.[8] Therefore, it claims that it was permitted to dismiss the appeal.

As this case requires us to construe C.J. § 12–302, we shall begin our analysis by setting forth the applicable principles of statutory construction. The cardinal rule in statutory construction is to determine and effect the intent of the Legislature. *Oaks v. Connors,* 339 Md. 24, 660 A.2d 423 (1995); *Mayor of Baltimore v. Cassidy,* 338 Md. 88, 656 A.2d 757 (1995); *Privette v. State,* 320 Md. 738, 580 A.2d 188 (1990). The primary source for determining the Legislature's intent is the statute itself. *Allied Vending, Inc. v. City of Bowie,* 332 Md. 279, 631 A.2d 77 (1993); *State v. Patrick A.,* 312 Md. 482, 540 A.2d 810 (1988); *Jones v. State,* 311 Md. 398, 535 A.2d 471 (1988).

To ascertain the legislative intent, we consider the words of the legislation in their " 'ordinary and popularly understood meaning, absent a manifest contrary legislative intention.' " *State v. Bricker,* 321 Md. 86, 92, 581 A.2d 9 (1990) (quoting *In re Arnold M.,* 298 Md. 515, 520, 471 A.2d 313 (1984)); *see also Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994) (finding that to determine

---

8. Md. Rule 8–601 provides in pertinent part:

   (a) **By Notice of Dismissal.** An appellant may dismiss an appeal without permission of the Court by filing a notice of dismissal at any time before the filing of the opinion of the Court. Dismissal of an appeal shall not affect a cross-appeal that is timely filed.

   (b) **Where Filed.** The notice of dismissal shall be filed in the appellate court. If the record is in the lower court at the time the notice is filed, the appellant shall file a copy of the notice with the clerk of the lower court.

the legislative intent, "the Court considers the language of an enactment and gives that language its natural and ordinary meaning"). "Giving the words their ordinary and common meaning 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence,' normally will result in the discovery of the Legislature's intent." *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993) (internal citations omitted). The statute's legislative history, and its relationship to earlier legislation, are "external manifestations of intent" which the court may consider in determining the purpose of the legislature. *Rose v. Fox Pool Corp.,* 335 Md. 351, 643 A.2d 906 (1994); *Maryland Nat'l Bank v. Pearce,* 329 Md. 602, 620 A.2d 941 (1993). Further, "[t]hat which necessarily is implied in the statute is as much a part of it as that which is expressed." *Soper v. Montgomery County,* 294 Md. 331, 335, 449 A.2d 1158 (1982) (*citing Guardian Life Ins. Co. of America v. Insurance Comm'r of Maryland,* 293 Md. 629, 643, 446 A.2d 1140 (1982); *Chillum–Adelphi Volunteer Fire Dep't., Inc. v. Board of County Comm'rs for Prince George's County,* 247 Md. 373, 377, 231 A.2d 60 (1967); *Restivo v. Princeton Constr. Co.,* 223 Md. 516, 525, 165 A.2d 766 (1960)).

In analyzing the statute's language, however, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994); *see also State v. Thompson,* 332 Md. 1, 8, 629 A.2d 731 (1993) (stating that the court must reach an interpretation of a statute that is compatible with common sense). Moreover, absent a clear manifestation to the contrary, a statute should be read so that no word, sentence or section is rendered surplusage, superfluous, meaningless, or nugatory. *Buckman,* 333 Md. at 523–24, 636 A.2d 448; *State v. 149 Slot Machines,* 310 Md. 356, 361, 529 A.2d 817 (1987); *Board of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185 (1982). On the other hand, the rules of statutory interpretation do not permit us "under the guise of construction, to supply omissions or remedy possible defects in the statute, or to insert exceptions not made by the Legisla-

ture." *Amalgamated Cas. Ins. Co. v. Helms*, 239 Md. 529, 535–36, 212 A.2d 311 (1965). *See also Simpson v. Moore*, 323 Md. 215, 227, 592 A.2d 1090 (1991). Finally, courts strictly construe statutes in derogation of the common law. *Bruce v. Dyer*, 309 Md. 421, 431–32, 524 A.2d 777 (1987); *James v. Prince George's County*, 288 Md. 315, 335, 418 A.2d 1173 (1980); *MacBride v. Gulbro*, 247 Md. 727, 729, 234 A.2d 586 (1967).

The purpose of C.J. § 12–302 is to permit the State to seek immediate review of a trial court's decision suppressing evidence, in order to avoid having to proceed to trial without material evidence.[9] But the statute imposes a harsh consequence if the suppression order is upheld; the State must dismiss all charges against the defendant and cannot pursue further charges arising from the same incident. By imposing the harsh consequence of mandatory dismissal, the Legislature made clear its intent that the State should pursue appeals under the statute only in a limited number of cases, when the

---

9.  Similar bills were presented in the Senate in 1980 (Senate Bill 46) and 1981 (Senate Bill 196), and in the House of Delegates in 1981 (House Bill 516). House Bill 516 passed in both houses of the General Assembly, but was vetoed by Governor Harry Hughes because it contained provisions allowing a defendant to appeal the denial of a suppression motion prior to conviction. The Governor was concerned that the legislation would spawn so many cases that it would overburden the docket of this court. *See* Letter from Governor Harry Hughes, vetoing House Bill 516 (May 19, 1981) (contained in the Legislative Bill File for Senate Bill 39 in 1982).

The notes of the Senate Judicial Proceedings Committee concerning Senate Bill 46 in 1980 indicate that the Committee heard testimony that the right to appeal was needed in "exceptional cases". Legislative Bill File, Senate Bill 46, 1980 (undated, handwritten notes contained in the working papers of the Judicial Proceedings Committee). Further, the House Judicial Proceedings Committee notes concerning Senate Bill 196 in 1981 state that "Presently, the State cannot at any time appeal a ruling excluding evidence, so the State is forced to either try the case on insufficient evidence, or dismiss." Legislative Bill File, Senate Bill 196 (1981) (handwritten notes). The notes also indicate that the provision requiring the release of the defendant on bail was added "because, presumably, if the State were not able to take the appeal, it would have to dismiss the charges for insufficient evidence, and the defendant would be released." *Id.*

suppressed evidence is important to the prosecution and the State truly believes that the trial court erred.

While the statute imposes certain restrictions on the State and the case must be dismissed if the State loses the appeal, it is readily apparent that the statute does not expressly prohibit withdrawing the appeal. Moreover, as the Court noted in *Carroll County v. Edelmann,* 320 Md. 150, 166–67, 577 A.2d 14 (1990), since at least 1825, Maryland has permitted an appellant to withdraw an appeal before the appellate court issues its opinion. *See Edelmann,* 320 Md. at 166, 577 A.2d 14 (citing *Diffenderffer v. Hughes,* 7 H. & J. 3, 4 (1825), and *Newson's v. Douglass,* 7 H. & J. 417, 454 (1826)).

Practical considerations also make it unlikely that the Legislature intended to bar the State from withdrawing its appeal. The statute requires the State to decide quickly whether to lodge an appeal; an appeal must be taken within 15 days of the suppression order. Fifteen days may be insufficient time for the State to obtain and review a transcript of an evidentiary suppression hearing, in order to determine if the State has a meritorious claim to justify the risk of losing on appeal. Nor is there any basis to conclude that the Legislature intended to preclude any reconsideration by the State of its decision to appeal. Yet that would be the inevitable result if we were to adopt appellee's position that an appeal may not be withdrawn. Further, if, as appellant contends, only the Attorney General may act in the appellate courts, the appellate oversight provided by that office, and its interest in developing uniform policy and caselaw, would be completely frustrated if it were unable to withdraw appeals that it determined were ill advised.

We also disagree with McNeil that the withdrawal of an appeal constitutes an inherent abuse of the statute. McNeil concedes that the statute contemplates that the State will continue to investigate its case, since presumably, if the State prevails in its appeal, the case will go forward. If, during the pendency of the appeal, the State uncovers new evidence that renders the suppressed evidence unnecessary to the prosecu-

tion, the State, understandably, might opt not to incur the risk of losing on appeal. To force the State to pursue an appeal under such circumstances would defeat the statute's salutary purpose.

■ McNeil argues, too, that the State's withdrawal of the appeal should have the effect of an affirmance of the trial court's decision, thus requiring the State to dismiss the charges against him. This argument ignores the essential purpose of the statute. The State must dismiss the charges under the statute only if the appellate court ultimately agrees with the trial court's decision on the suppression issue. While the withdrawal of an appeal and an affirmance by the appellate court achieve the same result, in the sense that the trial court's suppression decision stands, they do not merit the same result under the statute.

■ We conclude that, when an appeal is noted pursuant to C.J. § 12–302, the State is not automatically barred from withdrawing the appeal. We disagree with the State, however, that the General Assembly intended to permit the State to withdraw its appeal *based on Maryland Rule 8–601.* Maryland Rule 8–601 was not in effect at the time the General Assembly enacted C.J. § 12–302(c)(3). *See Board. of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185 (1982) (stating the courts presume the Legislature is aware of the *existing law* concerning the subject matter of a new law under consideration); *see also Equitable Trust Co. v. State Comm'n on Human Relations,* 287 Md. 80, 88, 411 A.2d 86 (1980); *Bowers v. State,* 283 Md. 115, 127, 389 A.2d 341 (1978).

## II.

McNeil contends that the trial court lacked jurisdiction to try him because the appeal was still pending. Therefore, he asserts that his conviction is invalid. He posits two grounds for this argument. First, he asserts that since we did not issue our mandate until after the trial ended, the trial court lacked jurisdiction to try the case. Second, he argues that, even if the State is entitled to withdraw its appeal, its attempt

to do so here was invalid because only the Attorney General is authorized to conduct proceedings in the appellate courts on behalf of the State; a prosecutor's attempt to withdraw the appeal is not valid.

■ As to the mandate, McNeil relies on Md. Rule 8–606, which states, in part:

(a) To Evidence Order of the Court.—Any disposition of an appeal, including a voluntary dismissal, shall be evidenced by the mandate of the Court, which shall be certified by the Clerk under the seal of the Court and shall constitute the judgment of the Court.

\* \* \* \* \* \*

(e) Effect of Mandate.—Upon receipt of the mandate, the clerk of the lower court shall enter it promptly on the docket and the lower court shall proceed in accordance with its terms....

While subsection (e) directs the trial court to proceed in conformity with the mandate, the rule does not expressly require the trial court to receive the mandate, or that the mandate be docketed, before proceeding with the case. In *Lemley v. Lemley,* 109 Md.App. 620, 675 A.2d 596 (1996), we held that the trial court did not lack jurisdiction to conduct proceedings in accordance with instructions on remand, when the trial court and the parties had received our mandate but the clerk had not yet docketed it. *Lemley* is factually distinguishable because, unlike in McNeil's case, our mandate had been issued at the time the trial court proceeded. Nevertheless, *Lemley* offers us guidance as to the effect of Maryland Rule 8–606 on the trial court's jurisdiction. There, we said:

The mandate serves to evidence the action of the appellate court on the particular judgment appealed from and to direct the lower court to proceed according to the tenor and directions of the opinion. The docketing of the mandate is simply a clerical function. As long as the proceedings are

conducted in accordance with the mandate, common sense dictates that the Rule is satisfied.

*Id.* at 630, 675 A.2d 596 (internal citations omitted).

Further, it is the date of filing of the appellate court's opinion that determines when the opinion is effective. *Firstman v. Atlantic Constr. & Supply Co.,* 28 Md.App. 285, 294 n. 12, 345 A.2d 118 (1975). "The mandate ... serves to direct the lower court to proceed according to its tenor and directions.... The opinion announces the law; the decision is expressed in the opinion; the mandate is the order issued on the decision." *Id. See also Harrison v. Harrison,* 109 Md. App. 652, 675 A.2d 1003 (1996) (holding that the court's opinion may be an integral part of the court's mandate when the mandate directs proceedings in conformance with the opinion or when the mandate is ambiguous). Similarly, in *Stewart v. State,* 287 Md. 524, 413 A.2d 1337 (1980), the Court determined that even if a mandate had not yet issued from this Court, affirming a waiver of jurisdiction order of the circuit court, the actions of the circuit court in accepting a subsequent indictment returned by the grand jury were not a nullity.

*Carroll County v. Edelmann,* 320 Md. at 166–67, 577 A.2d 14, is also instructive. Edelmann claimed that the trial court lacked jurisdiction to act on a motion to rescind its decision in the absence of a mandate from this Court dismissing an appeal by the County. The Court of Appeals disagreed. It said: "Because we conclude that the appeal from the September 4 judgment had effectively been dismissed before the September 24 order of rescission was entered, we find no procedural impediment to the entry of that order." *Edelmann,* 320 Md. at 166, 577 A.2d 14. The question here, then, is whether the State's appeal was effectively dismissed by the prosecutor.

As we noted, the prosecutor originally attempted to withdraw the appeal under Maryland Rule 8–203(a), which permits the trial court, on motion or on its own, to strike a notice of appeal for, *inter alia,* failure of the appealing party to pay the

filling fee for the appeal. That withdrawal apparently was not docketed. Subsequently, the prosecutor sought to comply with the trial court's suggestion to withdraw the appeal pursuant to Maryland Rule 8–601, which requires the filing of a dismissal of an appeal in the appellate court.

The State concedes that the Maryland Constitution authorizes the Attorney General to conduct proceedings on behalf of the State in the appellate courts. The Constitution provides:

The Attorney General shall:

(1) Prosecute and defend on the part of the State all cases pending in the appellate courts of the State, in the Supreme Court of the United States or the inferior Federal Courts, by or against the State, or in which the State may be interested, except those criminal appeals otherwise prescribed by the General Assembly.

Md. Const. Art. V, § 3. The Constitution further states:

It shall be the duty of the Clerk of the Court of Appeals and the Clerks of any intermediate courts of appeal, respectively, whenever a case shall be brought into said Courts, in which the State is a party or has interest, immediately to notify the Attorney General thereof.

Md. Const. Art. V, § 6.

Caselaw supports the view that the State's Attorney may act on behalf of the State only in the trial courts, and that the Attorney General must act on behalf of the State in the appellate courts. In *Murphy v. Yates*, 276 Md. 475, 348 A.2d 837 (1975), the Court considered the constitutionality of legislation that created a State Prosecutor to investigate certain crimes. The Court struck the legislation, saying: "It seems clear to us that from and after the adoption of the Constitution of 1867, the General Assembly was without power to limit or modify the constitutional duties of either the State's Attorneys or the Attorney General by transferring the duties of either of these offices to another officer created by statute." *Id.* at 488, 348 A.2d 837.

After analyzing the constitutional powers of the Attorney General and the State's Attorney, the Court concluded that the current Constitution, adopted in 1867, gives the State's Attorney the "constitutional powers and duties relating to criminal prosecutions at the trial level...." *Id.* But the Court noted: "At the appellate level, the recreated office of Attorney General was given the constitutional duty of representing the State in carefully defined areas." *Id.* Thus, *Murphy* suggests that the Constitution confers on the State's Attorney the power to act in the trial courts, while the power to act in the appellate courts is conferred upon on the Attorney General. *See also Hooper v. State,* 293 Md. 162, 169 n. 3, 443 A.2d 86 (1982) (when a case is pending in the appellate courts, "the Attorney General, rather than the State's Attorney, ordinarily has the authority and responsibility to represent the State.")

The case of *State v. Aquilla,* 18 Md.App. 487, 309 A.2d 44 (1973), is also instructive. There, we considered whether certain Special Assistant State's Attorneys were entitled to appear before the grand jury. We said: "The office of State's Attorney, being unknown at common law, is possessed of no other powers than those prescribed by the constitutions and statutes of the State...." *Aquilla,* 18 Md.App. at 493, 309 A.2d 44. Further, we recognized that the "responsibility for prosecuting criminal cases *at the trial level* devolved upon the State's Attorney by reason of his constitutional mandate as implemented by statute." *Id.* (emphasis added).

These cases lead us to conclude that the State's Attorney lacked the authority to withdraw the appeal under Maryland Rule 8–601. Nevertheless, we are satisfied that the trial court retained fundamental jurisdiction to try McNeil. In this regard, we rely on *Pulley v. State,* 287 Md. 406, 412 A.2d 1244 (1980). There, the Court of Appeals considered the defendant's claim that his interlocutory appeal, challenging the denial of a motion to dismiss the indictment on double jeopardy grounds, "suspended" the trial court's jurisdiction during the pendency of the appeal. Despite the appeal, the trial court proceeded with the trial, and the defendant was convict-

ed. In the Court of Appeals, the defendant argued that his conviction was a "nullity" because the trial court lacked jurisdiction to try him while the appeal was pending. *Pulley,* 287 Md. at 414, 412 A.2d 1244.

The Court disagreed with appellant's "conclusion that his exercise of this right [to appeal] deprived the trial court of its power, which we here denominate as 'fundamental jurisdiction,' to adjudicate the controversy relating to the subject matter of this criminal cause." *Id.* Rather, it determined that the trial court retained its "fundamental jurisdiction" over the case, although "its right to exercise such power may be interrupted" by statute, rule, or a stay. *Id.* at 417, 412 A.2d 1244. The Court defined "fundamental jurisdiction" as "the power to act with regard to a subject matter which 'is conferred by the sovereign authority which organizes the court, and is to be sought for in the general nature of its powers, or in authority specially conferred.'" *Id.* at 416, 412 A.2d 1244 (quoting *Cooper v. Reynolds,* 77 U.S. (10 Wall.) 308, 316, 19 L.Ed. 931 (1870)). Thus, the Court held that the trial court was only divested of jurisdiction to reconsider the particular decision on which the appeal was based. *Id.* at 417, 412 A.2d 1244.

*Pulley* has been applied in various procedural situations. In *State v. Peterson,* 315 Md. 73, 553 A.2d 672 (1989), the Court determined that the issuance of a writ of certiorari did not deprive the trial court of jurisdiction or render invalid a parole revocation decision rendered by the trial court after the writ issued. *See also In re Special Investigation No. 281,* 299 Md. 181, 473 A.2d 1 (1984) (holding that an appeal from a motion to quash a subpoena did not deprive the trial court of jurisdiction to issue a contempt order); *Eisenhardt v. Papa,* 46 Md.App. 375, 416 A.2d 784 (1980) (holding that a trial court's revision of an enrolled decree after an affirmance by the appellate court was voidable for improper exercise of the court's fundamental jurisdiction, not void for lack of jurisdiction); *Makovi v. Sherwin–Williams Co.,* 311 Md. 278, 283 n. 6, 533 A.2d 1303 (1987) ("Even when an appeal is taken from an appealable trial court interlocutory order, and thus when the

appeal is not premature, the trial court is not divested of fundamental jurisdiction to proceed.")

McNeil argues that *Pulley* is not applicable to his case because, as applied to C.J. § 12–302(c)(3), it would lead to absurd consequences. To illustrate this, he offers the following chart of the possible results if the trial court were to complete a trial prior to the issuance of the appellate court's decision concerning the State's appeal.

| Event One | Event Two | Event Three | Event Four | Result |
|---|---|---|---|---|
| Trial court suppresses evidence; State appeals | Defendant convicted pending appeal | Appeals court affirms trial court decision | Dismissal even after conviction | Trial court efforts wasted |
| Trial court suppresses evidence; State appeals | Defendant convicted pending appeal | Appeals court reverses trial court decision | ——— | Appeals court efforts wasted |
| Trial court suppresses evidence; State appeals | Defendant acquitted pending appeal | Appeals court reverses trial court decision | [Retrial barred] | Appeals court efforts wasted |
| Trial court suppresses evidence; State appeals | Defendant acquitted pending appeal | Appeals court affirms trial court decision | ——— | Appeals court efforts wasted |

We are unconvinced by appellant's argument. Although in the last two scenarios McNeil claims the appellate court's efforts would be wasted in deciding whether the trial court correctly suppressed the evidence, it is far more likely that the appeal would simply be dismissed as moot after the defendant's acquittal. We also observe that results similar to those outlined by McNeil would have followed from the procedural posture of the *Pulley* case.

Merely because the trial court possesses jurisdiction to try the case does not mean that it is necessarily advisable to do so. *Pulley*, 287 Md. at 418, 412 A.2d 1244;

*Peterson,* 315 Md. at 82 n. 3, 553 A.2d 672; *Levenson v. G.E. Capital Mortgage Services, Inc.* 101 Md.App. 122, 129, 643 A.2d 505 (1994), *rev'd on other grounds,* 338 Md. 227, 657 A.2d 1170 (1995). Of course, the trial court's order suppressing the evidence would remain in effect, so that the State would not be able to introduce the evidence that is the subject of the interlocutory appeal. Moreover, the potential waste of judicial resources will invariably be a factor for the trial court to consider in deciding whether to proceed with the trial. Further, in *Pulley,* the Court said: "In order to protect fully an accused's double jeopardy rights, trial courts should ordinarily permit a defendant who wishes to immediately appeal ... an opportunity to do so without requiring other stay procedures, and should only conduct the trial pending the appeal if the claim, in its view, is utterly without merit and the defense was interposed merely to accomplish unwarranted delay." *Pulley,* 287 Md. at 419, 412 A.2d 1244. Nevertheless, if the trial court determined to proceed to trial while an appeal was pending, its decision "would not be a nullity but would simply be subject to reversal on appeal." *Edelmann,* 320 Md. at 166, 577 A.2d 14 (citing *Pulley v. State,* 287 Md. 406, 412 A.2d 1244 (1980)). Thus, we conclude that although it may not be advisable for a trial court to proceed to trial after the State has taken an appeal under C.J. § 12–302(c)(3), the trial court retains the "fundamental jurisdiction" to do so.

## III.

Appellant complains that the court erred by failing to provide him with an evidentiary hearing to demonstrate the State's lack of good faith. We agree that the issue was not adequately addressed below.

It is undisputed that the State is statutorily obligated to act in good faith when taking an appeal under C.J. § 12–302(c)(3). *See Irvin v. State,* 23 Md.App. 457, 328 A.2d 329 (1974), *aff'd,* 276 Md. 168, 344 A.2d 418 (1975) (stating that under C.J. § 12–302(c)(1), the State may appeal the dismissal of an indictment "so long as the State's action is not deemed to

be oppressive and thus a possible violation of due process of law. In sum, the State must act in good faith."). Indeed, the requirement that the State act in good faith when appealing a suppression order is manifest in the numerous hurdles and restrictions placed upon the State. As we have noted, the State must: 1) file the appeal within 15 days of the trial court's order; 2) certify that the appeal is not for the purpose of delay; and 3) diligently pursue the appeal. Clearly, the General Assembly sought through these measures to ensure that the State would not pursue an appeal under C.J. § 12–302(c)(3) simply to take advantage of the delay occasioned by an appeal. It follows that if the State improperly pursues an appeal to gain an advantage by the delay, the State would be misusing the statute.

The State's obligation to pursue its appeal in good faith encompasses not just the decision to take the appeal, but the entire process thereafter. If the State determines that an appeal is no longer necessary, the State should not benefit, *after* it decides to drop the appeal, from its own delay in effectuating the withdrawal of the appeal. To construe the statute otherwise would permit the State to benefit from the delay, which contravenes the statute's express requirement that the appeal may not be taken for the purpose of delay.

McNeil alleged that the State did not act in good faith in pursuing the appeal. He proffered facts to support his claim and sought, through an evidentiary hearing, to establish the point at which the State decided to abandon the appeal and its deliberate delay in withdrawing the appeal. He also wanted to explore the extent of investigation the State conducted after the appeal was filed and whether, at the time the State noted its appeal, it had actually intended to abandon the appeal if it uncovered critical incriminating evidence.

Essentially, McNeil's argument that the State acted in bad faith is tantamount to an allegation that the prosecutor engaged in misconduct. Prosecutorial misconduct can take various forms. For instance, prosecutorial misconduct can arise from, *inter alia,* improper argument during trial, im-

proper use of peremptory challenges, vindictive prosecution, selective prosecution,[10] and failure to provide exculpatory evidence. While there are significant differences between a selective prosecution complaint and the complaint involved in this case, both claims focus on the prosecutor's motivation or intent. Therefore, we find it useful to consider selective prosecution cases in our evaluation of McNeil's claim.

The State enjoys wide discretion in its decision to prosecute, *Murphy v. Yates,* 276 Md. 475, 348 A.2d 837, and the judiciary is ordinarily reluctant to inquire into the executive's charging decisions. *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Nevertheless, a selective prosecution challenge requires an inquiry into the motivation of the prosecutor for bringing criminal charges against a particular individual. *United States v. Falk,* 479 F.2d 616 (7th Cir.1973). Similarly, the prosecution enjoys latitude in its decision to appeal under C.J. § 12–302(c)(3). Although the statute imposes restrictions with respect to the appeal, the prosecutor is entitled to decide whether to seek an appeal in a particular case. *See Murphy,* 276 Md. at 489, 348 A.2d 837 (holding that the State's Attorney's powers are not specifically defined in Maryland law, so that the State's Attorney enjoys "the broadest official discretion."); *see also Aquilla,* 18 Md.App. at 494, 309 A.2d 44 (recognizing the State's Attorney's broad power to "institute and prosecute" criminal cases). As with a selective prosecution claim, McNeil seeks the opportunity to scrutinize the motivations of the State in his case, for noting and then dismissing its appeal.

---

**10.** Selective prosecution occurs when the State seeks out persons for prosecution based on impermissible factors, such as race, or the exercise of constitutional rights, such as freedom of speech. Vindictive prosecution occurs when the State seeks to impose a harsher penalty upon a defendant in retaliation for the defendant's decision to exercise a constitutional right, such as the right to review of an alleged constitutional violation. *See United States v. Gutierrez,* 990 F.2d 472, 476 n. 1 (1993). *See also Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (selective prosecution); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (vindictive prosecution).

Several federal appellate courts have articulated standards governing the right to an evidentiary hearing in a selective prosecution claim. The Eighth Circuit has held that: "A hearing is necessitated only when the motion alleges sufficient facts to take the question past the frivolous state and raises a reasonable doubt as to the prosecutor's purpose." *United States v. Catlett,* 584 F.2d 864, 866 (8th Cir.1978). In *United States v. Saade,* 652 F.2d 1126, 1135 (1st Cir.1981), the court said the defendant is entitled to a hearing if the defendant "alleges some facts a) tending to show that he has been selectively prosecuted, and b) raising a reasonable doubt about the propriety of the prosecution's purpose." *See also United States v. Erne,* 576 F.2d 212, 216 (9th Cir.1978) (holding a defendant is entitled to a hearing " 'when enough facts are alleged to take the question past the frivolous stage.' ") (quoting *United States v. Oaks,* 508 F.2d 1403 (9th Cir.1974)); *United States v. Berrigan,* 482 F.2d 171, 181 (3rd Cir.1973) (holding a defendant is entitled to a hearing when there is a "colorable basis" for the allegation).

Recently, in *United States v. Armstrong,* —— U.S. ——, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), the Supreme Court addressed the showing that a defendant must make before the trial court should require discovery in connection with the claim of selective prosecution. The Court noted there were various formulations among the federal appellate courts on this issue, and concluded that they essentially articulated the same standard: the defendant must produce " 'some evidence tending to show the existence of the essential elements of the defense' discriminatory effect and discriminatory intent." *Armstrong,* —— U.S. at ——, 116 S.Ct. at 1488 (adopting the language of *United States v. Berrios,* 501 F.2d 1207, 1211 (2nd Cir.1974)). In both *Berrios* and *Armstrong,* the courts concluded that the evidence was insufficient to support the allegation of selective prosecution.

In *Armstrong,* the Court examined the respondent's evidence, which consisted of an affidavit supported by a "study". *Id.* at ——, 116 S.Ct. at 1483. In *Berrios,* the defendant's evidence consisted of a single affidavit. *Berrios,* 501 F.2d at

1210. The *Armstrong* Court did not clarify however, whether the showing of "some evidence" requires the defendant to submit evidence in the form of affidavits or other admissible documentation, or whether, as here, specific allegations submitted to the court by motion are sufficient. Other federal courts suggest that if the defendant *alleges* sufficient facts, the necessary showing has been made. *See Saade*, 652 F.2d at 1135; *Catlett*, 584 F.2d at 866; *Erne*, 576 F.2d at 216; *Berrigan*, 482 F.2d at 181.

We are mindful that the defense of selective prosecution is based on constitutional protections. Moreover, *Armstrong* determined only the issue of the standard applicable to a request for discovery. *Armstrong*, —— U.S. at ——, 116 S.Ct. at 1483. Nevertheless, we believe that reference to the standard articulated in *Armstrong* is appropriate. *Armstrong* relied on *Berrios*, and the standard there was crafted in response to a request for both discovery and an evidentiary hearing. *Berrios*, 501 F.2d at 1210. Other courts have also adopted standards similar to the one in *Armstrong* for evaluating a defendant's request for a hearing in a selective prosecution claim. *See Saade*, 652 F.2d at 1135; *Catlett*, 584 F.2d at 866; *Erne*, 576 F.2d at 216; *Berrigan*, 482 F.2d at 181.

We conclude that a defendant is entitled to a hearing, if timely requested, to prove or dispel his claim of misconduct if he proffers *verifiable facts* amounting to "some evidence tending to show the existence of" the State's bad faith. A mere general allegation of prosecutorial misconduct is not sufficient to warrant the granting of an evidentiary hearing, however. We also caution that such an evidentiary hearing is not a discovery device. Indeed, we share the concern of the Seventh Circuit that "the prospect of government prosecutors being called to the stand by every criminal defendant for cross-examination as to their motives ... is to be avoided." *Falk*, 479 F.2d at 620. Nevertheless, in limited circumstances, such an intrusion upon the prosecutor is warranted if the defendant "presents facts sufficient to raise a reasonable doubt" about the prosecutor's motive. *See Falk*, 479 F.2d at 620–21.

■ We turn to the question of whether McNeil presented "some evidence tending to show the existence of" a lack of good faith by the State. While the defense motion was not supported by affidavit, it appears that at least some of the allegations were readily verifiable by review of the court file.

As we observed earlier, McNeil specifically alleged that the State never paid the filing fee for the appeal, and that the State had issued trial subpoenas for the November 6, 1995 court date only days after lodging its appeal, despite the defense claim that the November court date was not meant as a trial date. Appellant also alleged that the State had acted improperly in questioning Bishop. He also complained that the State had never notified him of its intention to dismiss the appeal. Yet the State obviously knew it was going to withdraw the appeal, because it was prepared to go forward with the trial and its witnesses were ready. None of the points in the Stipulation addressed the allegations regarding the issuance of subpoenas, the decision to withdraw the appeal, or the timing of the withdrawal. Moreover, when the State took the appeal, it had to certify that the suppressed evidence constituted substantial proof of a material fact in the case. Its later decision to proceed to trial without the evidence may suggest that it never thought the evidence was material or, instead, that, due to developments in the investigation, the evidence was no longer material.

When the defendant asserts specific factual allegations that call into question the legitimacy of the State's conduct in connection with a statutory appeal that required the State to certify that its appeal was not for purposes of delay, the trial court should grant the request for an evidentiary hearing. Without a hearing, McNeil was unable to challenge the State's unsupported claim that it acted in good faith. Nor was counsel able to develop evidence in an effort to persuade the court of his position. If the evidence presented at the hearing had shown that the prosecutor intended to lodge the appeal in order to obtain other useful evidence while the appeal was pending, or that the prosecutor deliberately delayed withdrawing the appeal, after deciding it was unnecessary, in order to

continue to investigate, the defense would have arguably established that the State improperly used the appeal for the purpose of delay, in contravention of the statute.

Accordingly, we shall remand this matter for further proceedings consistent with this opinion. Should the court, on remand, conclude that the State did not act in good faith in lodging or in pursuing the appeal, the court will need to determine the appropriate remedy for a violation of C.J. § 12–302(c)(3). In this regard, we observe that McNeil sought as a remedy the exclusion of the evidence obtained by the State during the pendency of the appeal or the dismissal of the case. Since the trial court may conclude that the State acted in good faith, however, we shall consider McNeil's complaint regarding cross-examination.

## IV.

McNeil asserts that the State obtained his conviction in violation of his right to confront the witness against him under the Sixth Amendment to the U.S. Constitution and Article 21 of the Maryland Declaration of Rights. He argues that the trial court improperly limited his cross-examination of Bishop, precluding him from exploring Bishop's bias.

That McNeil had a right to confront the witness against him is beyond contention. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986); *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, *cert. denied,* —— U.S. ——, 117 S.Ct. 102, 136 L.Ed.2d 56 (1996). The Supreme Court has held that the essence of the right to confront witnesses is the right to cross-examination. *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965). Maryland law is in accord. *Ebb,* 341 Md. at 586, 671 A.2d 974; *Deinhardt v. State,* 29 Md.App. 391, 395, 348 A.2d 286 (1975); *State v. DeLawder,* 28 Md.App. 212, 216, 344 A.2d 446 (1975). Further, the tool of cross-examination permits the defendant to probe the motivation of a witness who is testifying against the defendant. *Greene v.*

*McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959). While the trial court retains discretion to control the scope of cross-examination, *Bruce v. State,* 328 Md. 594, 624, 616 A.2d 392 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993), the court must give wide latitude to establish bias or motive. *Ebb,* 341 Md. at 587, 671 A.2d 974; *Smallwood v. State,* 320 Md. 300, 307–08, 577 A.2d 356 (1990).

McNeil relies upon *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), to support his claim that the court improperly restricted his cross-examination. Applying *Davis,* this Court has said: "*Davis* makes clear that the refusal to allow the defense to demonstrate bias on the part of the prosecutor's principal witness through cross-examination is a denial of Due Process under the Fourteenth Amendment as well as an infringement upon Davis's Sixth Amendment rights." *Deinhardt,* 29 Md.App. at 397, 348 A.2d 286. In *Deinhardt,* a bench trial, the defense tried to demonstrate the prosecutrix's bias by showing that she brought sexual assault charges against the defendant because he threatened to bring assault charges against her. We held that the trial court denied the defendant's right to confrontation by refusing to allow the defense to question the witness about the threat. *Id.* at 395, 348 A.2d 286. We observed that if the court had permitted the cross-examination, the prosecutrix's answers may have persuaded the court that the witness was not credible. *Id.*

*Johnson v. State,* 332 Md. 456, 632 A.2d 152 (1993), is also pertinent. The Court determined that the defense should have been permitted to cross-examine the prosecutrix in a rape trial as to whether she had previously traded sex for drugs, and whether she was disappointed that the defendant failed to "pay" her in drugs after she engaged in sex with him. Despite Maryland's rape shield law, which generally prevents inquiry into the prior sexual practices of the prosecutrix, the Court said that these questions were relevant to the prosecutrix's motive for testifying that the defendant raped her. *Id.* at 474–75, 632 A.2d 152. *See also Smallwood v. State,* 320 Md. 300, 577 A.2d 356 (1990) (ordering a new trial after the

defendant was precluded from cross-examining his girlfriend about prior assault charges she had brought against him, in order to show the girlfriend was motivated to testify against him at his robbery trial because the defendant had been found not guilty of the assault charges).

In our view, the court below did not offend *Davis* and its progeny. At the trial, Bishop conceded that he gave two statements to the police concerning the robbery, and that he gave the second statement only a few days before trial. He explained that, in the first statement, he did not tell the police everything he knew about the robbery, because he did not want to become involved in the case, and he feared for the safety of his family if he got involved in a case involving drugs. Bishop also testified that, in the presence of the prosecutor, the police detective gave him the option of telling what he knew about the incident or instead having his rights "read" to him. While Bishop denied any "deals" or "promises" from the State, when asked if his second statement was voluntary, he replied, "That is correct, with the option that I was given to have my rights read."

Nevertheless, the court sustained the State's objections to defense counsel's inquiry concerning the particular questions that the prosecutor asked Bishop, and whether the prosecutor said anything "to make [Bishop] talk." At a bench conference, the court indicated that questions about what the prosecutor asked Bishop in the interview were not relevant. Although McNeil's motion for mistrial was denied, the court allowed McNeil to pursue whether it was the prosecutor or the police who offered to advise Bishop of his rights.

Moreover, in response to appellant's question regarding the significance of having his "rights read," Bishop said:

What it did to me, it put a shock in me because I am like I wasn't involved in it and here I am going to have my rights read. The first thing came to my mind, my family and newborn. So of course being in law enforcement, you are going to cooperate with law enforcement agent because you are a part of the team as well. I mean realistically speaking

I was going to cooperate, because I am not going to go to jail for something that I had nothing to do with.

On further questioning by appellant's counsel about Bishop's concerns if he did not cooperate with the police, Bishop said:

If I didn't cooperate I thought that my rights would be read, and I could very well lose my job. That means my home, my family, 'cause on my job you have to get a police clearance. Every year your commission has to be renewed, and that process consists of having a criminal investigation upon you. And if I even get in the criminal system, it is no job for me anymore.[11]

During closing arguments, defense counsel argued that Bishop was not credible. Defense counsel said:

Can you believe Bishop, Wayne Bishop? There is a man whose attitude toward truth is best revealed by his attitude toward his own statement, the May 17 statement.

    \*    \*    \*    \*    \*    \*

Truth depends on whether you want to get involved. That is what truth depends on. There is a gentleman you can rely on. There is a gentleman you can trust in. If he told you it was raining outside, you would check the window before you touched a rain coat.

    \*    \*    \*    \*    \*    \*

Well, Mr. Bishop says, I don't have any agreement with the State. The only agreement with the Blaise is to shut up and be quiet. Either—of course Blaise says he does. I don't have any agreement at all. I don't have any agreement with the State, but I sure do want to tell the truth now because I don't want to be arrested, read my rights. Maybe he can you tell us the same agreement to do when you are robbed yourself? Maybe they forced him to come up with this story. When Blaise's statement—they made him stick to Blaise's statement. He comes before you as a

---

**11.** Although the State objected to the question that spawned this answer, the answer was heard by the jury, and the transcript of the examination does not reveal that it was ever struck from the record.

person very much afraid that his special police officer license is going to be yanked away. He's going to be made to suffer and when asked, well what are you afraid of being arrested for, afraid of being arrested for the robbery? He doesn't answer that question. He doesn't know.

Now, those are the two liars. The problem, the real central problem with the State's case, is this: You got two liars on the stand, both potential accomplices. Neither one is sufficient to corroborate the other. You can't corroborate accomplice testimony with another accomplice. You get a grab bag of lies.

The foregoing makes clear that this case differs significantly from *Davis, Deinhardt,* and *Johnson.* Here, the defense had ample opportunity to pursue the issues of bias and motive. The defense was permitted to develop the factual setting surrounding Bishop's second interview with the police, and Bishop conceded that he felt pressured by the police to cooperate. Appellant was also permitted to elicit that Bishop cooperated with the State because of his desire to keep his job and to protect his family. From those admissions, appellant argued to the jury that Bishop's testimony was not credible.

The court did sustain the State's objections to a variety of defense counsel's other questions. These included whether Bishop lied in his first statement, why Bishop did not tell the police that he "lied" when he gave the second statement, what Bishop thought was the relationship between reading him his rights and going to jail, what Bishop thought might happen to him if he did not cooperate, for what crime Bishop thought the police might arrest him if he did not cooperate, whether Bishop thought he was a suspect, and who it was that made him afraid during the interview at the police station. The questions about Bishop's cooperation with the police were cumulative. The other questions were not relevant. More-over, as we noted, the trial court is vested with the discretion to control the scope of examination of witnesses. *Oken v. State,* 327 Md. 628, 612 A.2d 258, *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Trimble v. State,* 300 Md. 387, 478 A.2d 1143, *cert. denied,* 469 U.S. 1230, 105 S.Ct.

1231, 84 L.Ed.2d 368 (1985); *Velez v. State,* 106 Md.App. 194, 664 A.2d 387 (1995), *cert. denied,* 341 Md. 173, 669 A.2d 1361 (1996); *Jackson–El v. State,* 45 Md.App. 678, 415 A.2d 312 (1980). In the exercise of its discretion, the court properly refused to permit appellant to pose these questions. *Bruce,* 328 Md. at 624, 616 A.2d 392; *Smallwood,* 320 Md. at 307–08, 577 A.2d 356.

We conclude that appellant was given wide latitude to establish Bishop's bias. Any limitations imposed by the court concerning appellant's cross-examination did not infringe appellant's right to confrontation.

**CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. JUDGMENT TO ABIDE THE RESULT.**

**COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**